**Thomas W. STEVENS, et al., Plaintiffs,**

v.

**Harry RIFKIN, et al., Defendants.**

**No. C 81–3943–RPA.**

United States District Court,
N.D. California.

Oct. 17, 1984.

**714**

Thomas W. Stevens, Larry Weissman, Terrile Cox, Shirley Freitas, Terry Phillips, Ronald Landberg, Chester Neal, Jr., San Francisco, Cal., in pro per.

Philip S. Ward, Deputy City Atty., San Francisco, Cal., for the City and County of San Francisco.

Robert M. Arbuthnot, Ericksen, Arbuthnot, McCarthy & Kearney, Inc., San Francisco, Cal., for defendant SPCA.

Robert Fremlin, Robert Kavanaugh, R.J. Heher, Lillick, McHose & Charles, San Francisco, Cal., for defendant American Broadcasting.

Thomas F. Bertrand, Mead, Keenan & Bertrand, San Francisco, Cal., for defendants Rifkin and Rubenstein.

Ronald E. Mallen, Peter R. Kindem, Long & Levit, San Francisco, Cal., for defendant Mark I. Schickman.

Thomas E. Morton, Morton & Bennett, San Francisco, Cal., for defendants Scopus and Holden.

Eric Leimseider, Paul E. Rabin, Williams, Martinet & Rabin, San Francisco, Cal., for defendants.

## OPINION AND ORDER

AGUILAR, District Judge.

*Introduction*

This action is before the Court on various motions to dismiss or for summary judgment brought by many of the defendants to a complaint brought by the White Panther Party. Six members of the White Panther Party, and one of its associate members, join in the Complaint. The Complaint alleges violations of the civil rights laws and various state laws.

In the past few years, the White Panther Party and its members have become embroiled in a controversy surrounding the possession of a Victorian home in the Haight-Ashbury district of San Francisco. This controversy initially pitted the White Panther Party against two developers, their construction crew and attorney. The controversy later came to involve a company engaged in the business of supplying guard dogs, the Society for the Prevention of Cruelty to Animals, the San Francisco Police Department, the San Francisco District Attorney's Office, the American Broadcasting Companies, Inc., and one of its reporters. All these persons are defendants named in plaintiffs' Complaint.

The Court will summarize the factual allegations of the Complaint which explain plaintiffs' view of the above-mentioned controversy. However, the Court will first discuss the nature of the White Panther Party as asserted by plaintiffs in their Complaint.

The White Panther Party was founded in 1967, and was originally organized "to assist the Black Panther Party in the struggle against racism and the systematic use of illegal police power to destroy resistance to the profit system." Complaint, p. 3, lines 3–6. In more recent times, the White Panther Party has described itself as a "dissident organization actively resisting speculation in housing, the exploitation of tenants, the forced relocation of non-affluent people from the Haight-Ashbury district of San Francisco, and the concomitant illegal use of police power to hasten this

relocation." *Id.* at p. 3, lines 9–13. It states as its purpose "the education of the lower classes in their constitutional and human rights, and the defense of these rights against encroachment by the more affluent classes either through direct economic oppression or exploitation or through indirect oppression or governmental action unduly influenced by the affluent classes." *Id.* at p. 3, lines 17–22.

Understandably, in light of this background, the conflicts giving rise to this lawsuit began when developers decided to renovate, and thereafter rent out, a building on a parcel of property adjacent to property occupied by a member of the White Panther Party. The Court believes that a chart of the persons involved in the incidents comprising plaintiffs' Complaint will be an effective tool for future discussion of these incidents. Thus, the plaintiffs and defendants to this action, and their respective categories, are as follows:

I. *Plaintiffs*
 White Panther Party
 Thomas Stevens—member of the White Panther Party
 Larry Weissman—member of the White Panther Party
 Terrille Cox—member of the White Panther Party
 Shirley Freitas—member of the White Panther Party
 Terry Phillips—member of the White Panther Party
 Ronald Landberg—member of the White Panther Party
 Chester Neal, Jr.—associate of the White Panther Party

II. *Defendants*
 A. *Developers*
 Harvey Rifkin
 Michael Rubenstein

B. *Developer's Work Crew* [1]
 Scopus Construction Company
 Kenneth Baker—foreman of work crew
 Michael Robb—member of work crew
 Andrew Holden—member of work crew

C. *Developer's Attorney*
 Mark Schickman

D. *Governmental Defendants* [2]
 1. City and County of San Francisco
 2. *San Francisco Police Department Defendants*
 San Francisco Police Department
 Cornelius Murphy—Police Chief
 Doe.[3] Mucci—Captain
 George Eimil—Captain
 Doe Pera—Sergeant
 Doe Citizen—Sergeant
 Harold Suslow—Inspector
 James Bergstrom—Inspector
 Robert Barnes—Inspector
 Joseph Curtin—Officer
 Jeffrey Morlock—Officer
 Doe Higdon—Officer
 Doe Ritter—Officer
 David McLaughlin—Officer
 3. *San Francisco District Attorney Defendants*
 San Francisco District Attorney's Office
 Arlo Smith—District Attorney
 Alfred Giannini—Deputy District Attorney

C. *Media Defendants*
 American Broadcasting Companies, Inc.
 Carole Ivey [4]—Reporter

**1.** The individual work crew defendants are alleged to have acted within the course and scope of their employment, and at the direction of Rifkin and Rubenstein.

**2.** The individual City defendants are all sued in their individual and official capacities, and are alleged to have acted within the course and scope of their employment and official duties.

**3.** Plaintiffs alleged "Doe" first names when they were unsure of the correct first names.

**4.** Ivey is alleged to have acted within the course and scope of her employment, and at the direction of American Broadcasting Companies, Inc.

D. *Other Defendants*

K–9

Society for the Prevention of Cruelty to Animals

The Court now summarizes, according to the allegations of plaintiffs' Complaint, the facts giving rise to their claims for relief.

Plaintiff Stevens, a member of the White Panther Party, has resided at 1889 Oak Street for over ten years. In 1977, the adjacent property was brought by defendants Rifkin and Rubenstein. Rifkin and Rubenstein planned to renovate the property and rent out the units. They entered into a joint venture to develop and speculate the property.

Rifkin and Rubenstein formed Scopus Construction Company for the purpose of doing the renovation work on the property. Holden was hired as foreman of the work crew, and Baker and Robb were hired as members of the work crew. Schickman acted as Rubenstein's attorney in connection with all legal matters concerning the development of the property.

Between November 10 and 18, 1980, Rifkin and Rubenstein had guard dogs, furnished by K–9, placed on the property. Plaintiffs allege that the guard dogs were placed on the property under such circumstances as to make it reasonably likely that the dogs would attack plaintiffs. The dogs did in fact place plaintiffs in fear of their lives and their physical well-being. Despite requests by plaintiffs and other residents of the neighborhood, the dogs were not removed. Plaintiffs claim that Police Chief Murphy, Captain Mucci and the Society for the Prevention of Cruelty to Animals ("SPCA") failed to discharge their lawful duty to remove the guard dogs or arrest the persons responsible for the placement of the dogs.

A few days later, on November 20, 1980, assertedly as a result of communications between Rubenstein or his representative and Captain Mucci, four police officers, including Pera, Barnes and Curtin, came upon Stevens' property, and assaulted and battered Weissman. This was done allegedly in retaliation for his mere presence on the property and his insistence that a warrant was required for the police to enter the property. While Weissman was being assaulted by police officers, one of the officers allegedly told Neal to turn around so that he would not witness the assault. Weissman and Neal were both arrested and taken .to a police station. After an hour, Weissman and Neal were released from custody. According to plaintiffs, the arresting officers prepared a false police report stating that Weissman had a history of assaulting police officers with guns.

During this same period of time, Rifkin and Rubenstein decided that entry onto Stevens' property was necessary to do some of the renovation work required on the adjoining property. Plaintiffs allege that Rifkin and Rubenstein told the work crew to ignore any protests by occupants of the property when they came upon the property. They were told to use force against the occupants if necessary. Schickman allegedly told the work crew that they would not be prosecuted for their entries onto Stevens' property because of arrangements made with authorities of the City and County of San Francisco.

On December 1, 1980, the work crew entered Stevens' property and allegedly attempted to forcefully eject some of the plaintiffs who were there. The crew assaulted plaintiff Cox until plaintiff Weissman, armed with a shotgun, ordered them to stop. Holden then summoned the police. Mucci, Morlock, Citizen, Higdon and Ritter arrived and arrested Cox and Weissman, who were charged with felony assault. Plaintiffs allege that these charges against Weissman and Cox were based upon the previously mentioned improper police report. Plaintiffs also allege that in connection with the prosecution of these charges, Suslow and Giannini suborned perjurious statements from Baker and Robb concerning assault and battery by Weissman and Cox and threats made against them by members of the White Panther Party. Plaintiffs further allege that Suslow, Giannini, Bergstrom, and McLaughlin concealed

evidence from plaintiffs that could be used in the defense of Weissman and Cox.

American Broadcasting Companies, Inc. ("ABC"), through its local affiliate, KGO–TV, broadcast a live report as part of its five o'clock newscast by reporter Carole Ivey which allegedly falsely reported that several years earlier, members of the White Panther Party had shot at a police officer. This was done while the prosecution against Weissman and Cox was still pending (the charges were dismissed at the preliminary hearing). Plaintiffs allege that the broadcast followed a pattern of ABC to make derogatory statements about the White Panther Party. Plaintiffs further allege that ABC would time such statements so as to influence judicial proceedings adversely to members of the White Panther Party. Ivey was purportedly told the information she reported by Eimil, who knew that the preliminary hearing of Weissman and Cox was in progress and that the statement would be heard by many persons, including potential witnesses, jurors and judges.

Plaintiffs bring a fifteen-count complaint asserting various claims for relief based upon the above-described events and acts of the defendants. Those claims for relief that are the subject of defendants' motions to dismiss or for summary judgment will be discussed in greater detail in addressing those motions. Thus, the Court now merely summarizes plaintiffs' fifteen claims for relief.

For their First Claim for Relief, plaintiffs assert a conspiracy to violate plaintiffs' civil rights, prohibited by 42 U.S.C. Section 1985(3). Plaintiffs allege that Rifkin, Rubenstein, Schickman and Scopus Construction Company entered into a conspiracy designed to interfere with plaintiffs' quiet possession of their property. Plaintiffs charge that these defendants did this to force plaintiffs to abandon possession of the property, and that all the other defendants later joined in this conspiracy. In furtherance of the conspiracy, defendants committed assault, battery, trespass, intentional infliction of emotional distress, def-amation, invasion of privacy, false imprisonment and malicious prosecution against some or all of the plaintiffs.

Plaintiffs' Second Claim for Relief alleges that the actions of the Police Department defendants deprived plaintiffs of their civil rights in violation of 42 U.S.C. Section 1983.

In their Third Claim for Relief, plaintiffs allege that certain of the Governmental defendants failed to prevent wrongful acts to be committed against plaintiffs in violation of their civil rights. They allege that: (1) Police Chief Murphy and Captain Mucci knew of, but failed to remove, the guard dogs and arrest those responsible for their emplacement, (2) Mucci knew that there was no probable cause to charge plaintiff Cox with a felony on December 1, 1980, but failed to prevent filing of the charges, (3) District Attorney Smith knew that the felony charge against Cox was without probable cause, knew Weissman and Cox had committed no crimes, knew the prosecutions were in furtherance of the conspiracy and knew that suborned testimony was being used in support of the prosecution, and (4) that these defendants failed to prevent any of the above.

Plaintiffs' next claims for relief assert various violations of state law by defendants.

The Fourth Claim for Relief seeks redress for the assault, emotional distress and loss of quiet enjoyment of their property suffered by plaintiffs Cox, Stevens, Landberg and Weissman as a result of the presence of the guard dogs on the property adjacent to Stevens' property.

The Fifth Claim for Relief seeks redress for the assault, battery, false arrest and false imprisonment of plaintiff Weissman by police officers on November 20, 1980, and for the false arrest and imprisonment of plaintiff Neal on that same day.

The Sixth Claim for Relief seeks redress for alleged threats made by police officer Barnes to injure plaintiffs Weissman and Neal on November 20, 1980.

The Seventh Claim for Relief is for assault and battery by the members of the work crew on plaintiff Cox on December 1, 1980, and for the emotional distress suffered by Cox and by plaintiff Weissman as a result of these acts of the work crew.

By their Eighth Claim for Relief, plaintiffs seek relief against defendant Holden for falsely informing police of assaults by the White Panther Party; against police officers Morlock, Ritter and Higdon, and Police Captain Mucci for falsely arresting and maliciously prosecuting plaintiffs Cox and Weissman despite the knowledge of the Police Department defendants that the work crew had committed the only assaults and batteries; and against work crew members for making false statements to Inspector Suslow after the arrests of Cox and Weissman.

In the Ninth Claim for Relief, plaintiffs allege that the District Attorney defendants maliciously prosecuted plaintiffs Cox and Weissman, failed in their duty to bring criminal proceedings against the work crew, and suborned and encouraged the use of perjury by Baker and Robb to prosecute Cox and Weissman. In this claim for relief, plaintiffs also allege that the District Attorney defendants concealed a police report of a previous assault committed by defendant Robb.

The Tenth Claim for Relief is for malicious prosecution, subornation of perjury, refusal to arrest the true assailants of December 1, 1980, and concealment of evidence, by Police Department defendants Suslow and Bergstrom, who investigated the charges made against Cox and Weissman as a result of the December 1, 1980 incidents.

In their Eleventh Claim for Relief, plaintiffs seek redress for slander, allegedly constituting the broadcast by defendants ABC and Ivey that members of the White Panther Party had shot a police officer.

In the Twelfth Claim for Relief, plaintiffs assert slander against Captain Eimil for telling Ivey, and others, that White Panther Party members had previously shot a police officer.

Plaintiffs' Thirteenth Claim for Relief is brought pursuant to California Civil Code Section 51.7. Plaintiffs allege that the acts of defendants with respect to the guard dogs, and the assaults, batteries and threats against Cox and Weissman, were committed because of plaintiffs' political affiliations, and that these acts constitute a denial of plaintiffs' right to be free from violence pursuant to Section 51.7.

Plaintiffs' final two claims for relief seek injunctive relief. In the Fourteenth Claim for Relief, plaintiffs seek a permanent injunction restraining the Police Department defendants from warrantless entries on residences and businesses of White Panther Party members and associates, from physical attacks on and intimidation of White Panther Party members and associates, and from interfering, intimidating and driving away witnesses to police incidents involving White Panther Party members or associates.

The Fifteenth Claim for Relief seeks a permanent injunction restraining Rifkin, Rubenstein and their agents and employees from entering 1889 Oak Street without permission and from dumping garbage on 1889 Oak Street.

In addition to the above-mentioned injunctive relief, plaintiffs seek general, special and punitive damages in connection with their federal and state claims for relief.

All defendants, with the exceptions of Baker, Robb and K–9, bring motions to dismiss or for summary judgment. Plaintiffs also bring a motion to dismiss or to strike certain of the affirmative defenses raised by those defendants that have answered their Complaint. The Court will first discuss the defendants' motions. Because the grounds for dismissal or summary judgment raised by defendants are so numerous and various, the Court will present its discussion in the following manner. The Court will initially discuss the portions of the motions that would dispose of one or more of plaintiffs' claims for relief in their entirety as to all defendants.

Then, the Court will discuss the portions of the motions that would dispose of one or more of plaintiffs' claims for relief as to one or some of the defendants. Finally, the Court will discuss the portions of the motions addressing inadequate or inartful pleading. The Court will then conclude with a discussion of plaintiffs' motions.

1. *Must plaintiffs' first claim for relief be dismissed on the grounds that plaintiffs have not demonstrated a class-based, invidiously discriminatory animus?*

All defendants move to dismiss plaintiffs' First Claim for Relief, which asserts a conspiracy pursuant to 42 U.S.C. Section 1985(3). They base their motion on the grounds that there must be some class-based, invidiously discriminating animus behind the actions of the conspirators, that plaintiffs have not and cannot allege such animus, and therefore this claim for relief must be dismissed.

42 U.S.C. Section 1985(3) provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), is the modern benchmark for interpreting the proper application of Section 1985(3). The Supreme Court in *Griffin v. Breckenridge* for the first time decided that Section 1985(3) was intended to cover purely private conspiracies to deprive persons of their constitutional rights, as well as conspiracies where state action is present. *Id.* at 101, 91 S.Ct. at 1797. In deciding that Section 1985(3) was meant to apply to private conspiratorial action, the Court also decided to explain the general parameters of Section 1985:

That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others.... The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment.... The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

*Id.* at 101–102, 91 S.Ct. at 1798, footnotes omitted.

Thus commenced the phrase "class-based, invidiously discriminatory animus," a requirement for a cause of action under Section 1985(3) to lie. Lower courts have since grappled with this phrase in attempting to determine what conspiracies may be a subject of the section. It is also this phrase that defendants seize upon in arguing that any alleged conspiracy by defendants is not actionable under Section 1985(3). In their Complaint, plaintiffs allege that defendants' conspiracy was entered into, and the acts in furtherance of the conspir-

acy executed, out of hatred and malice toward, and with the intent to oppress, members of the White Panther Party in general and plaintiff members of the White Panther Party in particular, and to invidiously discriminate against the same. Plaintiffs' Complaint, p. 15, lines 20–24. Defendants contend that this does not constitute class-based, invidiously discriminatory animus redressable under Section 1985(3).

In opposition to defendants' contention, plaintiffs first assert that the class-based, invidiously discriminatory animus requirement is a requirement only where a purely private conspiracy is alleged, and that the Supreme Court in *Griffin v. Breckenridge* did not intend to impose this requirement upon conspiracies which involve state action, as alleged by plaintiffs.

Plaintiffs' assertion has support in case law. In *Selzer v. Berkowitz*, 459 F.Supp. 347 (E.D.N.Y.1978), the Court, as an alternative ground for its ruling, stated that where there is an allegation of state action with respect to the conspiracy, the *"Griffin* standard of class-based discriminatory animus is not required." *Id.* at 351. The Court stated that it based this ruling upon an analysis of the Supreme Court's decision in *Griffin*, and the Supreme Court's analysis therein of the legislative intent behind Section 1985(3).

Specifically, the Court analyzed the *Griffin* decision as requiring a class-based discriminatory animus to prevent Section 1985(3) from becoming a general federal tort law once it had decided that private conspiracies were intended by the Legislature to be within the ambit of Section 1985(3). *Id.* The Court explained:

> [i]t must be noted and emphasized ... that the concern of the Supreme Court in *Griffin*, and of the legislators in so limiting the scope of 1985(3), was with its possible extension to any and all private conspiracies.... To argue ... that the concern voiced by the legislators and the Supreme Court over the propriety and legitimacy of excessive prohibition of purely private conspiracies also applies

to conspiracies involving state action is to subvert the obvious legislative intent. It is simply inconceivable to this Court that the legislators who framed Section 1985(3), as well as the Supreme Court that decided the *Griffin* case, did not intend that it apply to any and all conspiracies involving state action which threaten deprivation of rights protected under the statute, even if such conspiracies are not motivated by a class-based discriminatory animus and are simply directed solely at the individual.

*Id.* at 351–52, footnote omitted.

Despite the conviction of the *Selzer v. Berkowitz* court, the opposite conclusion regarding the necessity of class-based, discriminatory animus where persons acting under color of state law are among those alleged to be part of the conspiracy was reached by the court in *Lesser v. Braniff Airways, Inc.*, 518 F.2d 538 (7th Cir.1975), whose decision was also based upon an analysis of the *Griffin* decision. The *Lesser* court analyzed *Griffin* as holding that the term "equal" used in Section 1985(3), prohibiting deprivation of *equal* protection of the law, or *equal* privileges and immunities under the laws, was the derivation for the class-based, invidiously discriminatory animus requirement. *Id.* at 540. Thus, in addressing the argument that the discriminatory animus requirement is only applicable to purely private conspiracies, the court stated that such an argument would read the term "equal" out of Section 1985(3), except in cases where there is no state action present. As such, the term "equal" is not a necessary element of every Section 1985(3) cause of action, but an "alternative jurisdictional base." *Id.* at 541. Thus, the court rejected the argument "as being inconsistent with the broad language and historical analysis found in the Supreme Court's opinion in [*Griffin* ] ... and as imposing on the plain language and organization of Section 1985(3) a wholly unnatural construction." *Id.* at 541. By the *Lesser* court's quotation from the *Griffin* decision, the court apparently analyzes *Griffin* as holding that Section 1985(3) applies to

private conspiracies. The *Lesser* court felt that the *Griffin* court held this way because of the breadth of the language of the section, and Congress' failure to limit the section to require state action, and the presence of the term "equal" (the term that requires a class-based discriminatory animus) in the section without limitation as to its application. *Id.* at 542–43.

■ The few cases, in addition to the above two cases, that have directly ruled on the requirement of discriminatory animus where state action is alleged, have largely followed the *Lesser* court's lead. *See e.g. Petrone v. City of Reading*, 541 F.Supp. 735, 740 (E.D.Penn.1982). There is no precedent in this Circuit to guide this Court.[5] Though their argument is compelling, this Court too must reject plaintiffs' argument that class-based, invidiously discriminatory animus is not required where state action is alleged in connection with a conspiracy, based upon its reading of *Griffin*.

The *Griffin* court specifically stated that its decision that Section 1985(3) reached purely private conspiracies as well as conspiracies involving state action was based upon the words of the statute. The *Griffin* court felt their decision was supported by the statute's legislative history, the judicial construction of related laws, and the "structural setting" of Section 1985(3). *Griffin*, 403 U.S. at 96, 91 S.Ct. at 1795. Thus, the court stated that the words of Section 1985(3) "fully encompass the conduct of private persons," *Id.*, and that "the failure to mention any such [state action] requisite can be viewed as an important indication of congressional intent to speak in § 1985(3) of *all* deprivation of 'equal protection of the laws' and 'equal privileges and immunities under the laws,' whatever their source." *Id.* at 97, 91 S.Ct. at 1796. The concern that Section 1985(3) could be a general tort law for all conspiracies was alleviated by the court's interpretation of

the term "equal" as requiring the discriminatory animus. The court felt that that was the intention of the legislators in amending the earlier version of the statute to add the language requiring an intent to deprive of equal protection of the law or of equal privileges and immunities under the law. *Id.* at 99–102, 91 S.Ct. at 1796–1798.

In light of the *Griffin* court's holding that the words of Section 1985(3) be given their plain meaning, without a state action limitation, it would be inconsistent with that reasoning to find that when there is state action a discriminatory animus is not required. Thus, the *Griffin* decision compels the conclusion that the requirement of a class-based, invidiously discriminatory animus discussed therein is applicable to all conspiracies alleged under Section 1985(3), and not just to purely private conspiracies.

The question now before the Court, then, is whether plaintiffs have alleged some class-based, invidiously discriminatory animus which motivated defendants' alleged conspiracy such that plaintiffs are entitled to Section 1985(3) protection. Though "animus" speaks of the intent or purpose of the conspiracy, courts uniformly classify the status of the plaintiff to determine whether the motivation of the conspirators was invidiously discriminatory. What constitutes a class-based, invidiously discriminatory animus has been interpreted differently by the federal courts. *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 719–20 (9th Cir.1981), and cases cited therein.

In the present case, plaintiffs allege that defendants' purported conspiracy was motivated "out of hatred and malice toward and with intent to oppress members of the White Panther Party in general, and plaintiff members of the White Panther Party in particular, and to invidiously discriminate against same." Complaint, p. 15, lines 20–24. Plaintiffs describe the White Panther

---

5. *Cf. Blevins v. Ford*, 572 F.2d 1336, 1338 (9th Cir.1978), *Cooper v. Molko*, 512 F.Supp. 563, 569 (N.D.Cal.1981), where the courts held, in cases involving state actors, that a class-based, invidiously discriminatory animus was required.

However, neither court was presented with the argument made by plaintiffs here that discriminatory animus is not required where state action is alleged.

Party in their Complaint as "a dissident organization actively resisting speculation in housing, the exploitation of tenants, the forced relocation of non-affluent people from the Haight-Ashbury district of San Francisco, and the concomitant illegal use of police power to hasten this relocation," Complaint, p. 3, lines 8–13; and as "an unincorporated association which has as its purposes the education of the lower classes in their constitutional and human rights, and the defense of these rights against encroachment by the more affluent classes either through direct economic oppression or through indirect oppression by governmental action unduly influenced by the affluent classes," Complaint, p. 3, lines 16–22.

■ The Court believes that the status of the "class" of which plaintiffs are members, as pled in their Complaint, is a dissident political group organized to effect, or at times prevent, political and social change. For the reasons stated below, the Court concludes that such a class is sufficient for purposes of Section 1985(3) protection.

The Ninth Circuit has not yet decided whether a class whose members are discriminated against because of their political beliefs or associations are entitled to Section 1985(3) protection. Although other courts are in disagreement, persuasive opinions from courts in some circuits have found political groups to be entitled to Section 1985(3) protection. This Court believes that this conclusion is consistent with the legislative intent in enacting the Ku Klux Klan Act, and the expressed Ninth Circuit policy regarding finding a particular class to be protected for Section 1985(3) purposes.

Courts from four circuits have held that political groups are entitled to Section 1985(3) protection. *Keating v. Carey*, 706 F.2d 377 (2nd Cir.1983), *Scott v. Moore*, 680 F.2d 979 (5th Cir.1982), *rev'd.* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)[6], *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir.), *cert. denied* 423 U.S. 930, 96

S.Ct. 280, 46 L.Ed.2d 258 (1975); *Means v. Wilson*, 522 F.2d 833 (8th Cir.1975), *cert. denied* 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976). Two of these courts were particularly thorough in analyzing the legislative history behind the Ku Klux Klan Act and explaining why political groups were intended by that enacting Congress to be entitled to the protection of the Act. *Keating*, 706 F.2d at 387–88; *Scott*, 680 F.2d at 992–93.

The initial starting point in determining that political groups are entitled to Section 1985(3) protection is the conclusion that the Ku Klux Klan Act was largely intended to protect Republicans from the activities of the Ku Klux Klan. The *Keating* and *Scott* courts came to this conclusion based upon statements from congressional leaders made in debate on the Act. For example:

Congress believed that the victims of this violence were carpetbaggers or "men of Union sentiment," in a word, Republicans.

\* \* \* \* \* \*

"The dead and the wounded, the maimed and the scourged, are all, all Republicans." *Id.* at 426, col. 3 (remarks of Congressman McKee). "[E]very victim of Ku Klux outrage has been a Republican." *Id.* at 437, col. 2 (remarks of Congressman Cobb). The Klan's object is "the defeat of Republicanism." *Id.* at app. 196, col. 2 (remarks of Congressman Snyder). The Klan's "systematic plan ... is not to leave in any of those States a brave white man who dares to be a Republican or a colored man who dares to be a voter." *Id.* at 702, col. 1 (remarks of Senator Edmunds). The Klan's "purpose is by these innumerable and nameless crimes to drive those who are supporting the Republican Party to abandon their political faith or to flee from the state".... *Id.* at app. 252, col. 1 (remarks of Senator Morton). Finally, those "who vote with the party ... or who accept a petty office from a Republican Administration, are in much of the

6. The reversal by the Supreme Court will be discussed, *infra*.

country continually in imminent peril for their lives." *Id.* at 654, col. 1 (remarks of Senator Osborn).

*Keating,* 706 F.2d at 387, footnotes omitted; *see also Scott,* 680 F.2d at 992–93.

Statements from members of both houses evidence this purpose of the Act to protect lawful political activity from the conspiratorial acts of others. Senator John Sherman stated in support of the legislation against the Klan:

"Here is a political organization; with political ends, political aims; it shows that the object and intent of that political organization is to prevent large masses of the people of the southern states from enjoying a right which has been guaranteed to them by the Constitution of our country."

Congressional Globe, 42d Cong., 1st Sess. 153 (1871).

Said Representative Ellis Roberts:

But one rule never fails: the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans. They may be black or white; they include those who wore the blue and those who wore the gray; newcomers and life-long residents, but only Republicans. Stain the door lintels with the mark of opposition to reconstruction and of hostility to the national Administration and the destroying angel passes by. Omit that sign and the torch may kindle the roof that covers women and children.... Such uniformity of result can come only from design. Republicans only are beaten and mutilated and murdered, because the blows are aimed at Republicans only.

Cong.Globe, 42d Cong., 1st Sess. 412–13 (1871).

*See generally,* Avins, *The Ku Klux Klan Act of 1871,* 11 St. Louis U.L.J. 331 (1967); Comment, *A Construction of Section 1985(c) in Light of Its Original Purpose,* 46 U.Chi.L.Rev. 402 (1979); Comment, *Private Conspiracies to Violate Civil Rights,* 90 Harv.L.Rev. 1721 (1977).

The analysis of these motivating factors as evidencing a political purpose to the Act is excellently achieved by the *Keating* court:

The tensions that erupted following the Civil War had their source, at least in part, in the *ante bellum* social and economic disparities between the increasingly urban and industrialized North, and the relatively poorer, agrarian South, and in the consequent Southern resentment of what the South considered to be Northern social condescension and economic exploitation. This nonracially related hostility towards carpetbaggers, those of Republican persuasion, was greatly enhanced by the Northern occupation. Much of the South regarded as vindictive and corrupt the radical Republican Reconstruction governments, which took as their aims, in addition to providing civil rights for blacks, the social and economic transformation of the South. In enacting the Civil Rights Act of 1871, Congress sought, among other things, to contain this extraordinarily heated dispute within lawful democratic processes and to prohibit acts of political recrimination that deprived their victims of equal privileges and immunities or the equal protection of the laws.

*Keating,* 706 F.2d at 387, fn. 17.

This Court must agree with the conclusions of these courts that the Ku Klux Klan Act was motivated in large part as a desire to inhibit one political group from attempting to violate the civil rights of another political group. This is the best interpretation of the Act.

This conclusion also appears not to be contrary to Ninth Circuit pronouncements on the subject, and in fact can be considered consistent with those pronouncements.

In the first major case of the Ninth Circuit to address the class of persons entitled to the protection of Section 1985(3), *Life Insurance Co. of North America v. Reichardt,* 591 F.2d 499 (9th Cir.1979), the court held that women were a sufficient

class for Section 1985(3) protection. In so holding, the court stated:

Section 1985's drafters clearly intended to protect groups other than oppressed southern blacks. The Congressional debates evinced concern for all groups subject to the organized lawlessness of the Ku Klux Klan, including all Unionists, Republicans and certain religious groups. Courts construing § 1985(3) have not limited its protection to racial or other-wise suspect classifications.

*Id.* at 505.

Next, in *De Santis v. Pacific Telephone and Telegraph Co., Inc.*, 608 F.2d 327 (9th Cir.1979), the Ninth Circuit held that homosexuals were not a sufficient class for Section 1985(3) protection. In so holding, the court continued the theme of the *Reichardt* court that Section 1985(3) encompassed groups that the government has determined require special assistance in protecting their civil rights, but found that homosexuals have not been determined by Congress to be deserving of this special protection. The court explained:

While § 1985(3) has been liberated from the now anachronistic historical circumstances of reconstruction America, we may not uproot § 1985(3) from the principle underlying its adoption: the Governmental determination that some groups require and warrant special federal assistance in protecting their civil rights. This underlying principle must continue to determine the coverage of § 1985(3).

*Id.* at 333.

The Ninth Circuit has since found discrimination on the grounds of indigency, *Glover v. Tower*, 700 F.2d 556, 558 (9th Cir.1983), and anti-police bias, *Canlis*, 641 F.2d at 720, not to constitute the type of class-based, invidiously discriminatory animus encompassed and prohibited by Section 1985(3). However, in those and other similar rulings, the Ninth Circuit adheres to its initial statements in the *Reichardt* and *De Santis* cases.

Thus, as the Ninth Circuit has specifically recognized that the drafters of Section 1985(3) intended to protect those subject to the lawless activities of the Ku Klux Klan, including Republicans, *Reichardt*, 591 F.2d at 505, it would appear that the Ninth Circuit would be in full accord with the decisions of the *Keating* and *Scott* courts, and in fact the earlier quoted language from *Reichardt* is "on all fours" with the *Keating* and *Scott* cases. As the Ninth Circuit recognizes that the drafters of the Ku Klux Klan Act intended to protect Republicans, it would follow that the Court would therefore accept the theory that the Act was designed to protect from organized violence groups whose members' rights are subject to deprivation because of their political beliefs. And because the drafters of Section 1985(3) intended to protect political groups from the organized lawlessness of the Ku Klux Klan, this intention constitutes a governmental determination that such groups are entitled to special protection of their civil rights. *De Santis*, 608 F.2d at 333. Thus, the pronouncements of the Ninth Circuit are consistent with a conclusion that political groups are subject to protection under Section 1985(3).

The Court is fully aware of the doubt that has been shed upon the conclusion that political groups are entitled to Section 1985(3) protection by the recent Supreme Court decision of *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). That case reversed the Fifth Circuit's *Scott v. Moore* decision previously discussed. The Fifth Circuit held that as political groups were intended to be encompassed as protected by Section 1985(3), non-union employees were also intended to be protected by Section 1985(3) because "an animus directed against nonunion association is closely akin to animus directed against political association." *Scott v. Moore*, 680 F.2d at 994.

In *United Brotherhood v. Scott*, the Supreme Court held that Section 1985(3) was not intended to "reach conspiracies motivated by bias towards others on account of their *economic* views, status or activities." *Scott*, 103 S.Ct. at 3360, emphasis in origi-

nal. In so holding, the court did not specifically rule on the validity of the interpretation of Section 1985(3) as protecting political groups. *Id.* 103 S.Ct. at 3359–60. However, the majority of five stated that "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans." *Id.* 103 S.Ct. at 3359. The majority further stated:

> ... we find difficult the question whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means.

*Id.*

As the Supreme Court expressly does not determine whether Section 1985(3) reaches beyond "combatting the violent and other efforts of the Klan and its allies to resist and frustrate the intended affects of the Thirteenth, Fourteenth, and Fifteenth Amendments," *Id.* 103 S.Ct. at 3360, the prior, contrary conclusion of the Circuits discussed above remain unchanged by the Supreme Court's decision. And importantly, the minority of four in the *Scott* case set forth a strong statement in opposition to the majority's "doubts." Explains the minority: "The Ku Klux Klan Act was the Reconstruction Congress' response to politically motivated mob violence in the postbellum South designed to intimidate persons in the exercise of their legal rights." *Id.* 103 S.Ct. at 3361. The minority summarize that the purpose of the Act is found in the legislative authorities and conclude that Congress intended only a "functional definition of the scope" of the Act, and not a list of actionable class traits. *Id.* 103 S.Ct. at 3367. And that functional classification, as evidenced by the legislative history, is that Congress intended to provide a federal remedy for all classes that seek to exercise their legal rights in unprotected circumstances, i.e., where violence could occur because general opposition to the political class renders local law enforcement authorities less likely to protect the rights of the

persons affiliated with the unpopular policies. *Id.*

The majority's suggestion, and the conclusion of some courts, that Section 1985(3) does not protect political groups renders the section practically meaningless today. To make the statement, as the majority does, that it is doubtful that Section 1985(3) extends beyond preventing the Klan from frustrating the intended effects of the Civil Rights Amendments, *Id.* 103 S.Ct. at 3360, would mean that the section can only be used to redress conspiracies by the Ku Klux Klan. The Ku Klux Klan no longer holds the political stature it did at the time of the enactment of the Act. Therefore, such a holding would eradicate scores of decisions applying the Act to other deserving groups, such as other racial minorities, women, etc. Such a stringent and narrow interpretation of Section 1985(3) is unwarranted.

It is clear that the purpose behind the Ku Klux Klan Act was to federally protect the rights of persons from deprivation on account of their lawful political beliefs, activities, and associations. This deprivation of rights would especially occur in a climate where local law enforcement authorities are unlikely to diligently protect those rights. Permitting minority political groups to exercise their rights has been historically treasured in America, and is often thought of as the device for accomplishing political change. To leave minority, or less popular, political groups without Section 1985(3) protection could render them without protection at all. Otherwise, the majority, and the law enforcement authorities responsible to that majority, can unlawfully infringe upon the rights of the minority simply because they are part of the majority. Any other remedy could well be valueless as controlled by the majority.

Such could be the situation in the present case. Plaintiffs have alleged that the local law enforcement authorities have assisted in the deprivation of plaintiffs' rights. It may be in the interests of the ruling majority to suppress plaintiffs' attempts at seeking lawful political and social change. Such suppression must be redressable by Section 1985(3), and this seems clearly

within the contemplation of the drafters of that section.

■ The Court must point out that it is proceeding on the basis of plaintiffs' pleading only, and passes no judgment on the legitimacy of plaintiffs' goals. Plaintiffs' Complaint pleads only lawful attempts at political and social change. As Section 1985(3) is interpreted to protect political groups in the lawful exercise of their rights, any unlawful activity would exclude plaintiffs from Section 1985(3) protection. However, no such evidence is before the Court. As plaintiffs' Complaint alleges that plaintiffs are members of a political group, and as plaintiffs allege further that that group is the subject of a class-based invidiously discriminatory animus and a conspiracy to deprive plaintiffs of their civil rights, and as plaintiffs' "class" as alleged exists independently of the defendants' alleged actions and is not defined simply as the group of victims of the defendants' actions, plaintiffs have stated a claim for relief under Section 1985(3).

2. *Should plaintiffs' federal claims for relief be dismissed because they attempt to state causes of action directly under the Constitution?*

■ The Governmental defendants move to dismiss plaintiffs' federal claims for relief on the grounds that plaintiffs appear to allege claims directly under various amendments to the United States Constitution. The defendants' contention is without merit as it is clear that plaintiffs' references to provisions of the Constitution that they believe defendants have violated support their federal statutory claims for relief under 42 U.S.C. Sections 1983, 1985(3) and 1986.

3. *Should plaintiffs' Second Claim for Relief for violation of 42 U.S.C. Section 1983 be dismissed as to defendant Eimil because he is alleged as having only made defamatory statements, and defamation cannot constitute a constitutional violation cognizable under Section 1983?*

The Governmental defendants contend that no cause of action against defendant

Police Captain Eimil is stated in plaintiffs' Complaint pursuant to 42 U.S.C. Section 1983 because the only action he is alleged to have taken is that he falsely told a television reporter and others about charges against the White Panther Party, and such a defamation does not rise to the level of a constitutional violation cognizable under 42 U.S.C. Section 1983.

In *Paul v. Davis,* 424 U.S. 693, 703, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976), the United States Supreme Court held that injury to reputation is not a liberty or property interest protected by the due process clause of the Fourteenth Amendment, and therefore does not present an actionable claim under 42 U.S.C. Section 1983. However, *Paul v. Davis* merely holds that no liberty or property interest is infringed when the *only* loss suffered is damage to personal reputation, *Marrero v. City of Hialeah,* 625 F.2d 499, 513 (5th Cir.1980), and to state a claim involving reputation which *Paul v. Davis* would not prohibit, plaintiff must allege the loss of a recognizable property or liberty interest in conjunction with the allegation of injury to reputation. *Paul v. Davis,* 424 U.S. at 712, 96 S.Ct. at 1165; *and see Poirier v. Hodges,* 445 F.Supp. 838, 843 (M.D.Fla.1978).

■ In the present case, plaintiffs allege that defendant Eimil made false charges regarding the White Panther Party knowing that the preliminary hearing of Weissman and Cox was still in progress, and that if the statement were broadcast it would be heard by hundreds of thousands of persons including potential and actual witnesses, jurors and judges in those proceedings. Complaint at p. 15, lines 11–17. In the analogous case of *Kaylor v. Fields,* 661 F.2d 1177 (8th Cir.1981), plaintiffs brought a Section 1983 claim against a prosecutor contending that he disseminated accusations to the press in an attempt to deprive plaintiffs of their right to an impartial jury panel in the event of prosecution. *Id.* at 1180. The court held that this claim "charged" a denial of a constitutional

right—the right to an impartial jury in a criminal prosecution, guaranteed by the Sixth and Fourteenth Amendments." *Id.* at 1181. Thus, where the injury to reputation is coupled with the violation of a constitutionally protected liberty or property interest, the defamation does not bar the action under *Paul v. Davis.* Therefore, to the extent plaintiffs' claims of damage to their reputations are coupled with their claims that the defamatory statements deprived them of their right to a fair and impartial trial, plaintiffs state a claim for relief under Section 1983.

In their statement of constitutional violations in support of their claim for relief under Section 1983, plaintiffs allege that the conduct of defendants violated their Fourteenth Amendment right not to be deprived of liberty without due process of law. Complaint at p. 20, lines 6–8. Plaintiffs do not set forth that the conduct of defendants violated their Sixth Amendment right to a fair and impartial trial. The Court finds that the factual allegations of plaintiffs' Complaint that the defamatory statements of defendant Eimil were made knowing that the preliminary hearing was in progress and that if the statements were broadcast they would be heard by potential and actual witnesses, jurors and judges, coupled with plaintiffs' allegation that this conduct violated their right not to be deprived of liberty without due process of law in violation of the Fourteenth Amendment, is sufficient to state a claim of relief for violation of Section 1983 based upon the above legal principles. However, plaintiffs may well wish to make this position clear by amending their Complaint to specify that the defamatory comments violated their Sixth and Fourteenth Amendment right to a fair and impartial jury in a criminal prosecution.

■ There is an additional basis for finding that the plaintiffs have stated an actionable claim for relief under Section 1983 in connection with defendant Eimil's defamatory statements. Recent case law has held that actionable Section 1983 actions where reputation is involved are not limited

to situations where a defamatory communication causes the loss of a protected right, but also includes situations where the defamation incurs in connection with, or is reasonably related to, the deprivation of a constitutional right. Thus, where the injury to reputation is inflicted in connection with the denial of a right specifically secured by the Bill of Rights, as opposed to the injury to reputation causing the denial of a right secured by the Bill of Rights, the defamation is actionable. *Marrero v. City of Hialeah,* 625 F.2d at 519.

In *Marrero,* the prosecutor made defamatory statements regarding plaintiffs following an allegedly illegal search and seizure of plaintiffs' business and allegedly illegal arrests of plaintiffs. The court held, based on these pleadings, that the defamatory statements were actionable under Section 1983 because the public "surely perceived the defamatory statements made ... to be connected to the arrests and search and seizure." *Id.* at 519. The court explained:

We can discern no rational reason why reputation should be accorded any less protection when the injury to reputation is inflicted in connection with the denial of a right specifically secured by the Bill of Rights than when the injury occurs in connection with the denial of a state-created right or interest such as employment. Just as the state, as employer, may not create and disseminate a false and defamatory impression about an employee in connection with his termination, so the state, in enforcing its laws, may not issue false and defamatory statements about its citizens in connection with an unlawful arrest or search and seizure without complying with due process.

*Id.*

■ In the present case, plaintiffs indicate that the defamatory statements were made in connection with their unconstitutional arrests and prosecution. The public would therefore associate Eimil's statements as connected to the arrests and prosecution. Thus, as the alleged defamation

occurred in connection with the alleged violation of plaintiffs' constitutional rights, the injury to plaintiffs' reputation constitutes the deprivation of liberty interests, and is actionable under 42 U.S.C. Section 1983.

4. *Should plaintiffs' federal claims for relief against the individual San Francisco District Attorney defendants be dismissed based upon prosecutorial immunity doctrines?*

The Governmental defendants contend that plaintiffs' federal claims for relief must be dismissed against defendants Smith, the District Attorney for the City and County of San Francisco, and Giannini, a Deputy District Attorney for the City and County of San Francisco, as the prosecutorial immunity doctrine of *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), provides them with absolute immunity in connection with the actions alleged against them in this lawsuit.

Pursuant to *Imbler v. Pachtman*, a prosecuting attorney acting within the scope of his or her duties in initiating and prosecuting a state's criminal prosecution is absolutely immune from a civil suit for damages for deprivation of constitutional rights. *Freeman on Behalf of the Sanctuary v. Hittle*, 708 F.2d 442, 443 (9th Cir.1983). Thus, where the prosecutor is acting within the scope of his or her authority and in a quasi-judicial capacity, he or she is entitled to absolute immunity. *Beard v. Udall*, 648 F.2d 1264, 1271 (9th Cir.1981). But where the prosecutor is acting in an administrative or investigative capacity, he or she is entitled only to a qualified immunity. *Id.* at 1271, fn. 8. To determine whether the prosecutor is acting in the quasi-judicial capacity, the functional nature of the official's behavior that is being challenged is examined. *Imbler*, 424 U.S. at 430, 96 S.Ct. at 994.

In the present case, plaintiffs challenge the actions of the two prosecutors in connection with their allegedly maliciously prosecuting Weissman and Cox, using perjured testimony, suborning perjured testi-

mony, fraudulently concealing evidence of defendant Robb's previous assault, and failing to arrest, charge and prosecute defendants Robb, Baker and Holden for their crimes, particularly those crimes committed against plaintiffs. Complaint at p. 13, line 28 through p. 14, line 32.

The individual prosecutor defendants' actions as alleged by plaintiffs are all subject to the *Imbler* doctrine and therefore these defendants are absolutely immune from civil rights violations in connection with these acts. The acts of these defendants relate to their roles as advocates on behalf of the state in instituting and prosecuting for the state. Malicious prosecution, failure to prosecute and questionable activities in connection with obtaining evidence are not performed in an administrative or investigative capacity, but in a quasi-judicial capacity as they are acts in connection with initiating and presenting the state's case.

The acts of the defendant prosecutors to which plaintiffs object have been found by courts to be covered by the absolute prosecutorial immunity doctrine. Decisions as to who to prosecute, i.e., malicious prosecution, who not to prosecute, and the evidence used in that prosecution, are subject to the absolute immunity doctrine as quasi-judicial activities. *Imbler*, 424 U.S. at 424–427, 96 S.Ct. at 992–993. The knowing use of perjured testimony is also subject to absolute immunity, *Blevins v. Ford*, 572 F.2d 1336, 1339 (9th Cir.1978), as is falsification of evidence and coercion of perjured testimony, *Lee v. Willins*, 617 F.2d 320, 322 (2d Cir.), *cert. denied* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980), and concealing exculpatory evidence. *Brawer v. Horowitz*, 535 F.2d 830, 834 (3d Cir.1976).

Plaintiffs make an impassioned argument that the policy behind absolute prosecutorial immunity is no longer supportable in light of the increased power of prosecutors to exercise discretion in determining when and when not to prosecute. In light of these broad powers, and the broad immunity, a citizen who falls in disfavor with prosecutors will likely have no redress.

The *Imbler* court acknowledged that the immunity doctrine leaves a genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. However, the court found that the alternative of qualifying the prosecutor's immunity would disserve the broader public interest and the proper functioning of the criminal justice system. *Imbler*, 424 U.S. at 427–428, 96 S.Ct. at 993–994. This Court finds that there is no reason to change the well established and well reasoned result in *Imbler*.

Accordingly, plaintiffs' First, Second and Third Claims for Relief must be dismissed with respect to defendants Smith and Giannini as they are absolutely immune from damages on these causes of action.[7]

5. *Should the defendants' state law claims for relief against the Governmental defendants be dismissed based on California Government Code immunities?*

The Governmental defendants contend that the Eighth through Tenth Claims for Relief, asserting defendants' state law claims, are barred by state statutory immunities. As earlier discussed, the Eighth Claim for Relief addresses the arrest, imprisonment and prosecution of Weissman and Cox. The Ninth Claim for Relief pertains to the malicious and improper methods of prosecution of Weissman and Cox. The Tenth Claim for Relief relates to Police Inspector Suslow's improper acts in connection with the evidence used in the prosecution of Weissman and Cox and the failure to arrest members of the work crew.

The immunities asserted by the Governmental defendants are Government Code Sections 815.2(b) and 821.6. California Government Code Section 821.6 provides:

A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause.

California Government Code Section 815.-2(b) provides:

Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.

These statutory immunities preserve the established common law immunities from malicious prosecution necessary to enable law enforcement and prosecuting authorities to function. *Jackson v. City of San Diego*, 121 Cal.App.3d 579, 586, 175 Cal. Rptr. 395 (1981). However, the California Tort Claims Act, which preserves these immunities from malicious prosecution, also specifically declares that a public employee, and derivatively the public entity, remains liable in tort for false arrest or false imprisonment. Cal.Govt.Code § 820.4; *Jackson v. City of San Diego*, 121 Cal.App.3d at 586, 175 Cal.Rptr. 395.

■ Though plaintiffs do not specifically set forth titles to their Eighth, Ninth and Tenth Claims for Relief, it is clear that the Ninth and Tenth Claims for Relief pertain to prosecution activities of law enforcement and prosecuting authorities. Therefore, the Ninth and Tenth Claims for Relief are barred by the California Government Code statutory immunities, and must be dismissed.

■ Plaintiffs' Eighth Claim for Relief alleges improper prosecutorial activity, as well as false arrest and imprisonment. Pursuant to California Government Code Section 820.4, the Governmental defend-

7. In their opposition to the prosecutor defendants' motion to dismiss, plaintiffs candidly admitted that *Imbler* required dismissal of their claims, and they acknowledged that this Court was bound by that authority. Plaintiffs then discussed why they will plan to appeal this decision and seek a change to the *Imbler* doctrine. The Court must express its appreciation of plaintiffs' candidness in accepting established judicial precedents, which they acknowledged a number of times throughout their papers in connection with these motions. Such candidness is refreshing, and this Court would certainly be pleased if trained professionals would endeavor to dispute less the established teachings of courts.

ants remain liable in tort to plaintiffs for false arrest or imprisonment. Thus, though a portion of plaintiffs' Eighth Claim for Relief addressing the prosecutorial activities must be dismissed, the portion of the claim for relief asserting false arrest and imprisonment may remain.

Though plaintiffs may state a claim for false arrest or imprisonment pursuant to Government Code Section 820.4, plaintiffs have not pled all the necessary elements of false arrest and false imprisonment. 3 Witkin, *California Procedure*, Section 622 (2d Ed.1971). Therefore, that portion of plaintiffs' Eighth Claim for Relief that alleges false arrest and false imprisonment against the Governmental defendants is dismissed with leave to amend for plaintiffs to allege the elements of false arrest and false imprisonment under California law.

6. *Should plaintiffs' claims for relief against defendant Schickman be dismissed on the grounds that his actions were privileged as they were taken pursuant to professional representation?*

Defendant Schickman, the attorney for defendant developers Rifkin and Rubenstein, moves to dismiss all claims for relief asserted against him on the grounds that his actions were privileged since any actions he took, that are the subject of plaintiffs' Complaint, he took in connection with his representation of Rifkin and Rubenstein.

The Court finds that the citations of defendant Schickman, and plaintiffs, do not bear on the question before the Court because, as the only claims for relief asserted by plaintiffs against defendant Schickman are those stated under the Civil Rights Act, the Court must determine the liability of an attorney for violation of an individual's civil rights in connection with the attorney's representation of his or her client. Defendant Schickman's citation to general civil liability is inappropriate.

■ Though there appears to be no clear rule of immunity with respect to the liability under the civil rights laws of attorneys who violate the civil rights of others while representing their clients, cases under the Civil Rights Act indicate that the attorney may be held liable for damages if, on behalf of the client, the attorney takes actions that he or she knows, or reasonably should have known, would violate the clearly established constitutional or statutory rights of another. See *Buller v. Buechler,* 706 F.2d 844, 852–853 (8th Cir.1983). Therefore, plaintiffs may state claims for relief for violation of their civil rights against defendant Schickman if plaintiffs allege that Schickman knew, or reasonably should have known, that the actions he took with respect to plaintiffs would violate their clearly established constitutional or statutory rights.

■ Plaintiffs allege against Schickman the following: "at all times mentioned herein, [Schickman] was an attorney for defendant Rubenstein" (Complaint at p. 5, lines 16–20); together with defendants Rifkin, Rubenstein, Schickman and Scopus Construction, Schickman "knowingly entered into a conspiracy designed to force plaintiffs to abandon possession of 1889 Oak Street and to interfere with the quiet and peaceful possession of the premises by plaintiffs Stevens, Cox, Weissman and Landberg, and to, in furtherance of this conspiracy, cause to be committed against plaintiffs assault, battery, trespass, intentional infliction of emotional distress, defamation, invasion of privacy, and, in the event of any resistance to these unlawful acts, to cause plaintiffs to be falsely imprisoned and maliciously prosecuted" (Complaint at p. 10, line 27 to p. 11, line 5); and, that the conspiracy "entailed, in its common design, a plan to deprive plaintiffs of their civil rights, to deny plaintiffs equal protection of the laws, to deprive plaintiffs of due process of law, and to deprive plaintiffs of their rights under the First, Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Fourteenth Amendments to the

United States Constitution." Complaint at p. 11, lines 17–22.[8]

Plaintiffs have alleged that defendant Schickman, in acting on behalf of his client, took actions which he knew or reasonably should have known would violate the clearly established constitutional or statutory rights of plaintiffs. Therefore, defendant Schickman's grounds for dismissal are without merit as plaintiffs have stated a claim for relief against defendant Schickman for violation of their civil rights.

7. *Should plaintiffs' Fourth Claim for Relief against defendants Rifkin, Rubenstein and Scopus Construction be dismissed because these defendants had no present ability to assault plaintiffs through the guard dogs?*

 Defendants Rifkin, Rubenstein and Scopus Construction move to dismiss plaintiffs' Fourth Claim for Relief on the grounds that they cannot be liable for an assault by emplacement of the guard dogs on the property adjoining plaintiffs' property because these defendants had no present ability to inflict injury upon plaintiffs. Plaintiffs' Fourth Claim for Relief appears not to be limited to an assault claim. It also pleads claims for intentional infliction of emotional distress and loss of quiet enjoyment of their premises. Plaintiffs allege that the guard dogs were trained to kill human beings, were placed on the adjacent property, had access to plaintiffs' property, and at least one dog stood menacingly on a porch that provided access to plaintiffs' property. Complaint at p. 24, lines 10–24. Plaintiffs claim that they suffered fear, mental anguish and emotional and physical distress as a result of the presence of these dogs on the adjoining property. *Id.* at p. 24, lines 26–30.

The alleged assault to plaintiffs consists of the threatening presence of the dogs such that plaintiffs were put in fear that the dogs could attack them. There are no allegations that the dogs ever attacked plaintiffs, or attempted to attack plaintiffs. It appears that the most severe activity by one of the dogs was standing menacingly on a porch.

The Court has been unable to locate any case law which discusses the liability of a dog owner for assault by the dog merely acting menacingly and threateningly, as opposed to actually biting or otherwise attacking. The Court is not willing to extend the assault doctrine to the activities which are the subject of plaintiffs' Fourth Cause of Action herein. The most helpful case that the Court could find for its conclusion is *Nava v. McMillan,* 123 Cal.App.3d 262, 176 Cal.Rptr. 473 (1981). In that case a dog owner was sued for negligence and strict liability by a minor who sustained injuries after being struck by an automobile when she stepped into the street after having allegedly been frightened by dogs of vicious disposition which were kept behind a chain link fence on the owners' property. *Id.* at 263–264, 176 Cal.Rptr. 473. The court affirmed the trial court's action in sustaining the owners' demurrer without leave to amend. In so doing, the court made a number of comments which would suggest that plaintiff's claim for assault would not be cognizable in California. For example, the court explained that "the consequences upon the community of imposing a duty as suggested by plaintiff would be totally unreasonable: the owner of a dog would in effect be required to keep 'man's best friend' in a place where it could neither be seen nor heard by members of the public passing by. In short, the duty sought to be imposed by plaintiff offends common sense." *Id.* at 266, 176 Cal. Rptr. 473. The court also stated that it is an "integral part of our whole system of private property that an owner or occupier of land has a privilege to use the land according to his own desires. This privilege is of course qualified by a due regard

---

**8.** Plaintiffs also allege that defendant Schickman told the work crew that they would escape prosecution for their acts against plaintiffs because of arrangements made with authorities of the City and County of San Francisco, and that there would be no adverse legal consequences against the work crew for coming upon the property located at 1889 Oak Street. Complaint, p. 12, line 30 to p. 13, line 4.

for the interests of others who may be affected by it. The possessor thus has a duty to make only a reasonable use of his property, without causing unreasonable risk of harm to others in the vicinity." *Id.*

In the present case, the emplacement of guard dogs appears to be part of a reasonable use of the property adjoining plaintiffs' property, and as there is no allegation that the dogs ever came on plaintiffs' property, it appears that plaintiffs' theory of assault against defendants imposes too great a burden upon defendants in connection with the use of their land. Absent any contention that the dogs actually bit or attacked plaintiffs, the Court, based upon the above authority, must find that plaintiffs have failed to state a cause of action for assault against defendants Rifkin, Rubenstein and Scopus Construction. Accordingly, to the extent the Fourth Claim for Relief seeks to hold these defendants liable on a theory of assault, this claim for relief must be dismissed.

■■■ Plaintiffs also seek to hold defendants Rifkin, Rubenstein and Scopus Construction liable for their emplacement of the dogs on the adjoining property under the theories of intentional infliction of emotional distress and a theory of loss of quiet enjoyment of the property. Plaintiffs have not sufficiently developed these theories, nor pled the necessary elements of these claims for relief, in their Fourth Claim for Relief. It does appear that plaintiffs may well be able to state a claim for relief against these defendants for intentional infliction of emotional distress, because such a cause of action is established "when it is shown that one ... intentionally subjects another to the mental suffering incident to serious threat to his well-being, whether or not threats are made under such circumstances as to constitute a technical assault." *State Rubbish Collectors Ass'n. v. Siliznoff*, 38 Cal.2d 330, 336, 240 P.2d 282 (1953). The Court at this time is not conclusively deciding whether plaintiffs would be able to state claims for relief for intentional infliction of emotional distress or lack of quiet enjoyment of their premises in connection with the presence of the guard dogs. However, the court will permit plaintiffs to further develop these theories by way of an amended claim for relief which should set forth more details in connection with their claims, and set forth the necessary elements of their asserted claims for relief. Accordingly, though plaintiffs cannot proceed in their Fourth Claim for Relief on an assault theory, the Court will dismiss plaintiffs' Fourth Claim for Relief with leave to amend to allege intentional infliction of emotional distress and/or loss of quiet enjoyment of the premises.

8. *Should plaintiffs' Thirteenth Claim for Relief be dismissed as to defendant Rifkin, Rubenstein and Scopus Construction because the use of guard dogs is not cognizable as the type of violence protected by California Civil Code Section 51.7?*

Defendants Rifkin, Rubenstein and Scopus Construction move to dismiss plaintiffs' Thirteenth Claim for Relief against them on the ground that the use of guard dogs could not have been contemplated as the type of violence that the Legislature intended to prohibit by California Civil Code Section 51.7.

That statute provides:

All persons within the jurisdiction of the state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex or position in a labor dispute.

Plaintiffs contend that the intimidation and threats of violence by the use of the guard dogs were committed against plaintiffs because of their political affiliation with the White Panther Party, and constitute a violation of Section 51.7.

Because of the unresolved status of plaintiffs' Fourth Claim for Relief, the Court will not now resolve whether this threatening use of the guard dogs can constitute a violation of Civil Code Section 51.7. The Court will reserve resolution of

this issue once plaintiffs' ability to assert common law claims for relief with respect to the guard dogs is resolved. Thus, the Court will not dismiss this portion of the Thirteenth Claim for Relief at this time.

The Court also notes that plaintiffs contend that even if the emplacement of the guard dogs was not the type of threat of violence contemplated by Section 51.7, Rifkin, Rubenstein and Scopus Construction are still liable for asserted acts of violence or threats of violence committed by other defendants on the grounds that all defendants are co-conspirators. Plaintiffs cite Civil Code Section 52(b) in support of their contention. Section 52(b) provides that a person who conspires to deny another of the rights provided by Civil Code Section 51.7 is liable for the offense.

Plaintiffs have not pled in the Thirteenth Claim for Relief that they seek to impose liability under Section 51.7, as to any defendant, on the grounds of conspiracy. Therefore, if plaintiffs wish to assert this basis for liability, they must amend their Complaint accordingly.

## 9. Should plaintiffs' Complaint be dismissed as to defendant Society for the Prevention of Cruelty to Animals?

As defendant Society for the Prevention of Cruelty to Animals (hereinafter "SPCA") had answered plaintiffs' Complaint prior to the bevy of motions discussed herein, defendant SPCA moved for judgment on the pleadings. The grounds for the SPCA's motion is that plaintiffs have failed to sufficiently allege a conspiracy involving the SPCA, that plaintiffs have failed to state material elements of the conspiracy between the SPCA and other defendants, and that the SPCA as a corporation cannot be a conspirator. Without resolving the issues, the Court will dismiss plaintiffs' Complaint as against the SPCA pursuant to its inherent power to dismiss frivolous lawsuits. The Court finds that this Complaint as to the SPCA is frivolous because it lacks any factual showing as to why the SPCA should have had some type of duty to come upon the proper-

ty of another to remove guard dogs. For example there is no allegation that the SPCA was asked to remove the dogs. Therefore, the Court dismisses plaintiffs' Complaint as to defendant SPCA.

## 10. Should plaintiffs' Eleventh Claim for Relief for Slander against defendants American Broadcasting Company, Inc. ("ABC") and Carol Ivey be dismissed on the grounds that any statements published by ABC and Ivey are privileged?

As ABC and Ivey had also already answered plaintiffs' Complaint, they now move for judgment on the pleadings with respect to plaintiffs' Eleventh Claim for Relief charging them with slander. ABC and Ivey seek judgment on the pleadings on the grounds that California law and the First Amendment of the United States Constitution make any statements they published privileged.

Defendants ABC and Ivey first claim a qualified privilege under California Civil Code Section 47(3). That statute provides that a privileged publication or broadcast is one made

In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for communication innocent, or (3) who is requested by the person interested to give the information.

Publication by the various forms of media regarding matters of public interest are, if made without malice, entitled to the Section 47(3) privilege. See e.g., *Rollenhagen v. City of Orange*, 116 Cal.App.3d 414, 422, 172 Cal.Rptr. 49 (1981). The Court has no doubt that the statements made by ABC and Ivey, which plaintiffs contend are slanderous, are matters within the public interest.

The question then is whether plaintiffs allege that the statements were made with malice. The Court has very serious concerns regarding this case going forward as

to defendants ABC and Ivey. It appears that they will likely, ultimately, be entitled to rely on the Section 47(3) privilege. However, the Court must conclude that, at the pleading stage, plaintiffs' allegations of malice are sufficient to defeat defendants' claim of the qualified privilege under Section 47(3). The same applies to defendants' claims under the First Amendment and with respect to the propriety of punitive damages, thus disposing of all three objections made by ABC and Ivey to plaintiffs' Eleventh Claim for Relief.

■■■■■ In their Eleventh Claim for Relief, plaintiffs allege that the statement made by Ivey was false, that the statement was broadcast "either knowing that it was false as it applied to plaintiffs or with a reckless disregard for whether it was true"; that "ABC and Ivey had no facts to indicate said statement was true and with minimal investigation of the public record could have established that said statement was false", that "ABC has repeatedly demonstrated a pattern of broadcast of derogatory statements over Channel 7 about the White Panther Party, the timing of which influenced the judicial proceedings adversely to the White Panther Party"; and, that the broadcast "was made maliciously, and defendants knowing the statements to be false made the statement with the intent to oppress plaintiffs and in furtherance of the conspiracy set forth hereinabove in the First Cause of Action." Complaint, p. 37, line 11 to p. 38, line 29. Thus, plaintiffs have sufficiently pled malice to defeat defendants' claim of a qualified privilege under Civil Code Section 47(3), *see e.g., Slaughter v. Friedman*, 32 Cal.3d 149, 157, 185 Cal.Rptr. 244, 649 P.2d 886 (1982); *Kelly v. General Telephone Co.*, 136 Cal. App.3d 278, 285, 186 Cal.Rptr. 184 (1982), to defeat defendants' First Amendment contention, *Gertz v. Robert Welch, Inc.*,

418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974), and to defeat defendants' claim regarding the propriety of punitive damages, *Gertz v. Robert Welch, Inc.*, 418 U.S. at 349–50, 94 S.Ct. at 3011–12.[9] Therefore, plaintiffs have stated a claim for slander against defendants ABC and Ivey in their Eleventh Claim for Relief.

11. *Should plaintiffs' Complaint be dismissed against the City and County of San Francisco for failure to satisfy the requirements for pleading a federal civil rights cause of action against a municipality?*

The City defendants move to dismiss plaintiffs' Complaint against the City and County of San Francisco on the grounds that plaintiffs have not met the requirements for pleading a federal civil rights cause of action against a municipality under 42 U.S.C. Section 1983. The City defendants argue that if this pleading of municipal liability fails with respect to plaintiffs' Section 1983 claim, plaintiffs' other civil rights claims, pursuant to 42 U.S.C. Section 1985(3) and Section 1986, also must fail as insufficiently plead.

42 U.S.C. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects, causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

By their Section 1983 action against the City, plaintiffs seek to hold the City responsible for deprivation of their civil rights in

---

9. ABC and Ivey claim that the statement constituted a relay of a statement made by a San Francisco police officer, that the statement was made under instantaneous reporting conditions, and that ABC and Ivey harbored no ill will against plaintiffs. Even though they may very well be meritorious, these claims are not appropriately raised at the pleading stage in light of plaintiffs' allegations meeting the pleading requirements. There is no dispute that plaintiffs will be required to prove actual malice under *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

connection with all acts alleged against the individual City defendants.

■ In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court set forth the requirements for stating a cause of action against a municipality for violations of Section 1983. In *Monell*, the Supreme Court rejected its earlier decision to provide immunity to municipalities for civil rights violations, *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *Monell* went on to hold that Congress by the Civil Rights Act intended that municipalities can be sued directly under Section 1983 for monetary, declaratory and injunctive relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers," or where the constitutional deprivation is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels" where the practice of state officials, though not authorized by written law, is "so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 690–691, 98 S.Ct. at 2035–2036. Thus, a municipality cannot be held liable solely because it employs a tortfeasor, but can be held liable where an action was taken pursuant to a municipal policy which caused a constitutional tort. *Id.* at 691, 98 S.Ct. at 2036. Explained the Court:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. *Id.* at 694, 98 S.Ct. at 2037.

The Court noted that in its ruling pertaining to this case it had "no occasion to address and ... [does] not address, what the full contours of municipal liability under § 1983 may be. We have attempted only to sketch so much of the § 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and expressly leave further development of this action to another day." *Id.* at 695, 98 S.Ct. at 2038.

The Supreme Court has not yet ruled upon the requisite allegations for a complaint to state a Section 1983 civil rights action against a municipality. However, the Supreme Court has said, as to complaints in general, that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to the relief requested. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).

There is little Ninth Circuit case law which has set forth the pleading requirements under *Monell*, although the Ninth Circuit case of *Ivey v. Board of Regents of the University of Alaska*, 673 F.2d 266, 268 (9th Cir.1982) which held that "vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss" but that there must be a direct connection between a municipality's acts and the alleged discrimination to state a claim under Sections 1981, 1983 and 1985(3).

The courts from other circuits and districts that have addressed the question of the pleading requirements for municipality liability under the Civil Rights Act have come to diverse results. At one extreme is *Schramm v. Krischell*, 84 F.R.D. 294 (D.Conn.1979), cited by the City in its present motion, which requires pleading specific prior instances of misconduct as a basis for a claim that a municipal custom was responsible for a Section 1983 violation. On the other extreme, in *Villa v. Franzen*, 511 F.Supp. 231, 235 (N.D.Ill. 1981), cursory allegations that acts were done under color and pretense of statutes,

regulations, customs and usages of the municipality were held sufficient.

In the present case plaintiffs allege in their Complaint:

> Defendant officers, agents, employees, servants, attorneys and representatives of the City and County of San Francisco, and each of them, were, at all times mentioned herein, acting in accordance with the unofficial policy and custom of the City and County of San Francisco to mistreat impoverished people in neighborhoods undergoing gentrification, to mistreat people who egregiously assert constitutional rights in the face of unlawful patterns of behavior practiced by public officials and wealthy and influential citizens, and to particularly mistreat members of the White Panther Party. Complaint at p. 10, lines 2–10.

\* \* \* \* \* \*

> Each and every act alleged herein of defendants ... [the police defendants] was done by said defendants under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the State of California, City and County of San Francisco, and under the authority of their office as police officers of said City and County. Complaint, p. 18, lines 8–15.

Though they do not specifically appear in the civil rights allegations of their Complaint, plaintiffs allege in other parts of their Complaint:

> Said threat was aggravated and given additional credibility by previous actions of Barnes with regard to plaintiff Weissman and other members of the White Panther Party, including: ... a warrantless police raid ... on August 6, 1975, which raid was declared unconstitutional ..., ... a long series of subsequent intimidations, hostility and asperity directed at plaintiff Weissman and other members of the White Panther Party by Barnes, three of which actions were subject of complaints on three separate occasions to the Internal Affairs Bureau of the San Francisco Police Department. Complaint, p. 27, line 30, to p. 28, line 12.

\* \* \* \* \* \*

> Defendant City and County of San Francisco, through the San Francisco Police Department and police officers thereof, has exhibited a pattern of warrantless, forcible entries into White Panther Party residences and places of business. There have been eight previous warrantless entries onto the premises of White Panther Party members, all located within a three block radius from the Haight Ashbury district of San Francisco. In each instance, no charge was ever filed based on the pretext for the warrantless entries. However, on three occasions, charges were filed for alleged assaults on police officers subsequent to the entries. On the fourth occasion, a twenty-two (22) year old woman was falsely arrested for suspicion of being a juvenile. Complaint, p. 41, line 25 to p. 42, line 5.

\* \* \* \* \* \*

> There have been at least nine (9) previous incidences of physical abuse of White Panther Party members or associates, while in police custody, by police officers of the City and County of San Francisco who knew victims to be members or associates of White Panther Party members. Complaint, p. 42, lines 14–18.

\* \* \* \* \* \*

> Defendant City and County of San Francisco, through the San Francisco Police Department and police officers thereof, threatens to continue warrantless entries into the residences and places of business of White Panther Party members, intimidation by threats of warrantless entries, assaults and batteries against White Panther Party members when in police custody, and interference with citizens who witness incidents involving police officers and members of the White Panther Party. Complaint, p. 42, line 29 to p. 43, line 4.

By this portion of their motion, the City defendants contend that plaintiffs' claims are conclusory, argumentative, lacking in

the necessary factual detail, and establish only *respondeat superior* 'liability. The Court must disagree. Plaintiffs have certainly met the extreme liberal standard of pleading municipal liability by the mere allegations that the acts were taken under the color and pretense of ordinances, regulations, customs and usages of the City and County of San Francisco. See *Villa v. Franzen,* 511 F.Supp. at 235. But plaintiffs pled a basis for imposing municipal liability even more specifically. Plaintiffs have alleged an unofficial custom and policy of the City and County of San Francisco to mistreat members of the White Panther Party. Such mistreatment is the subject of a number of the specific complaints made by plaintiffs in their Complaint. Furthermore, plaintiffs allege other examples of acts similar to those specifically set forth in their Complaint. Plaintiffs have therefore alleged a pattern or series of incidents of allegedly unconstitutional conduct, which constitutes an allegation of policy. These allegations permit an inference to be drawn that the policy in some way was the motivating force behind the injuries and constitutional deprivations allegedly suffered by plaintiffs. See *Starstead v. City of Superior,* 533 F.Supp. 1365, 1369 (W.D.Wis. 1982).

■■■ The Court at this time is not stating what, as a general rule, must be alleged to state a claim for relief under *Monell.* The Court does agree with the *Starstead* court and finds that in the present case, where an allegation of a custom of an unconstitutional act is supported by allegations showing a series of incidents of unconstitutional conduct, the inference that the unconstitutional conduct complained of in the lawsuit was part of an official policy or custom is appropriate and therefore properly pleaded. Therefore plaintiffs' Complaint sufficiently alleges a custom or policy and the City defendants' Motion to Dismiss is without merit.

■■ It should be noted that plaintiffs in their Opposition assert that some of the alleged acts which violated their constitutional rights were brought to the attention of appropriate city officials but that no disciplinary action was taken. Failure to take disciplinary action or to prevent known abuses can be a basis for *Monell* liability; however plaintiffs have not pled this theory in their Complaint. If plaintiffs wish to rely upon such failure to discipline or prevent known abuses they must so amend their Complaint.

In conclusion, plaintiffs have stated a claim for relief for municipal liability of the City and County of San Francisco. As a pleading of municipal liability under Section 1983 is now generally considered to be the pleading required under Section 1985(3), *see Ivey v. Board of Regents,* 673 F.2d at 268; *Owens v. Haas,* 601 F.2d 1242, 1247 (2nd Cir.1979) plaintiffs also sufficiently state a claim for relief against the City and County of San Francisco under 42 U.S.C. Section 1985(3).

12. *Should plaintiffs' claim for relief for violation of 42 U.S.C. Section 1985(3) be dismissed against defendants Murphy and Eimil on the grounds that plaintiffs have not pled the conspiracy of these defendants with sufficient particularity?*

The City defendants move to dismiss plaintiffs' 42 U.S.C. Section 1985(3) conspiracy claim against defendants Police Chief Murphy and Police Captain Eimil [10] on the grounds that plaintiffs have not pled the alleged conspiracy of these defendants with sufficient particularity. Specifically, defendants contend that plaintiffs fail to specify with particularity the overt acts committed by these two defendants in executing the alleged conspiracy.

■■■ To plead a claim for relief under 42 U.S.C. Section 1985(3), an allegation of overt acts is required, though an allegation of specific dates and meeting places is not

---

**10.** Defendant District Attorney Smith was also a subject of this portion of the City defendants' Motion to Dismiss. However, defendant Smith has been dismissed from plaintiffs' Complaint on other grounds and Smith will not be discussed further herein.

required. *Reichardt v. Payne*, 396 F.Supp. 1010, 1019 (N.D.Cal.1975). By subparagraphs 2 and 21 of paragraph XXVI of plaintiffs' Complaint, plaintiffs make the necessary allegations of acts of defendants Murphy and Eimil in furtherance of the conspiracy to deprive plaintiffs of their civil rights.

13. *Should plaintiffs' 42 U.S.C. Section 1983 claim for relief against defendant Murphy be dismissed as plaintiffs have no basis to impose supervisory liability against Murphy?*

The City defendants contend that defendant Murphy is sued only as a supervisor, and that plaintiffs have not pled a basis for imposing supervisory liability under Section 1983 against Murphy. Defendants have misstated plaintiffs' claims as they currently stand. Plaintiffs do not sue defendant Murphy as a supervisor liable for the acts of its officers, but as a person who took his own individual action to deprive plaintiffs of their constitutional rights. Plaintiffs allege that defendant Murphy personally participated in the decision not to remove the dogs. Thus, defendants' basis for dismissal is without merit.

Plaintiffs suggest in their papers in opposition to defendants' Motion that they have a theory against Murphy that he was consulted and actively cooperated in the attacks upon plaintiffs. Plaintiffs have not made these allegations in their Complaint, and if they wish to do so, they must amend their Complaint accordingly.

Additionally, supervisors may be liable for the acts of their officers not in a *respondeat superior* capacity, but in a *Monell* capacity. The supervisory officer may be liable for promulgating policies resulting in a constitutional violation or for failure to take remedial steps which could have prevented a constitutional violation. *Herrera v. Valentine*, 653 F.2d 1220 (8th Cir.1981). Plaintiffs suggest this theory in their papers before the Court but do not specifically plead it. If plaintiffs wish to so plead, they must amend their Complaint accordingly.

14. *Should plaintiffs' claim for injunctive relief against certain activities of the City defendants be dismissed as plaintiffs do not plead with particularity the facts justifying such relief?*

The City defendants contend that plaintiffs' Fourteenth Claim for Relief, which seeks to enjoin the City defendants from committing various acts against the White Panther Party and their businesses, residences, etc., must be dismissed as it does not sufficiently plead a basis for such extraordinary relief. In essence, defendants want plaintiffs to plead the facts behind each incident constituting the pattern of incidents necessary to justify the injunctive relief.

A court will only order injunctive relief into the internal operations of a police department in severe circumstances. In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) the Supreme Court found that the injunctive relief ordered by the district court as a result of 20 incidents occurring in a city of three million inhabitants with 7,500 policemen was improper. However, injunctive relief may properly be granted where there is a continued pattern of police misbehavior. *Commonwealth of Pennsylvania v. Porter*, 480 F.Supp. 686, 692 (W.D.Penn.1979); *and see Rizzo v. Goode*, 423 U.S. at 374–375, 96 S.Ct. at 605–606.

Plaintiffs' proposed injunctive relief seeks to restrain the defendants from violations of the rights of White Panther Party members, and plaintiffs allege in their Complaint a pattern of police misbehavior against members of the White Panther Party. Though discovery may reveal that there are insufficient factual instances of misconduct to base entry of injunctive relief, plaintiffs have sufficiently pled a claim for injunctive relief.

15. *Other bases for dismissal or judgment on the pleadings.*

Other grounds for dismissal or judgment on the pleadings have been made by de-

fendants. The Court rejects all of these other bases for dismissal or judgment and finds them to be not sufficiently meritorious to be desiring of discussion.[11] Accordingly, any claims raised by defendants and not specifically discussed in this Opinion and Order are rejected.

16. *Should plaintiffs' motions to dismiss or strike be considered at this time?*

Plaintiffs bring motions to dismiss or strike certain of the affirmative defenses raised by defendants ABC and Ivey.[12] The defenses which plaintiffs seek to strike are the boilerplate ones: no pendent jurisdiction, no subject matter jurisdiction, failure to state a claim upon which relief can be granted.

The Court sees no reason to conclusively resolve the applicability of these affirmative defenses at this time. Accordingly, the Court will deny plaintiffs' motions at this time without prejudice.

*Conclusion*

For all of the above reasons, and for good cause appearing therefor, IT IS HEREBY ORDERED in accordance with this Opinion that plaintiffs' Complaint be dismissed in part and not dismissed in part. To the extent the Court permitted plaintiffs to amend their Complaint, plaintiffs shall file their amended complaint within forty-five (45) days of the date of this Order.

IT IS SO ORDERED.

---

**11.** Such arguments include the contention that the White Panther Party is not a proper plaintiff to the Complaint and that the injunctive relief sought against defendants Rifkin and Rubenstein is not sufficiently particularly described.

**12.** Plaintiffs also bring motions to dismiss and to strike the affirmative defenses of the SPCA. As the Court has dismissed the SPCA as a defendant to plaintiffs' Complaint, the SPCA will not be further discussed herein.