**Earl Edwin GOBEL and Michael J. DeFranco, Plaintiffs–Appellants,**

v.

**MARICOPA COUNTY, Thomas E. Collins, David P. Stoller, and Frank Gary, Defendants–Appellees.**

No. 87–2351.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 18, 1988.

Decided Feb. 9, 1989.

Richard M. Gerry, Richard M. Gerry, P.C., Phoenix, Ariz., for plaintiffs-appellants.

Roger A. Burrell, former Deputy County Atty., and Cleon M. Duke, Deputy County Atty., Maricopa County Attorneys Office, Phoenix, Ariz., for defendants-appellees.

Before PREGERSON, CANBY and BEEZER, Circuit Judges.

PREGERSON, Circuit Judge:

Earl Edwin Gobel and Michael J. DeFranco appeal the district court's dismissal of their 42 U.S.C. § 1983 action for failure to state a claim. Gobel and DeFranco alleged in their civil rights complaint that Maricopa County, two county attorneys, and an investigator violated their constitutional rights by arresting them without probable cause due to mistaken identifica-

tions, issuing false statements to the news media, and subjecting them to illegal conditions of confinement.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse the judgment and remand for further proceedings.

## BACKGROUND

Gobel and DeFranco were each arrested on August 24, 1985, and charged with issuing bad checks in violation of Ariz.Rev. Stat. § 13–1807.[1] Both men were wrongly arrested as a result of mistaken identifications,[2] and the charges against both men were subsequently dropped.

On May 14, 1986, Gobel and DeFranco filed a civil rights action against Maricopa County, County Attorney Thomas Collins, Assistant County Attorney David Stoller, and investigator Frank Gary. Their amended complaint alleged that Collins ordered a public roundup of bad check offenders in order to enhance his public image and political career, and that, pursuant to this effort, the individual defendants caused criminal complaints and arrest warrants to be filed that resulted in Gobel and DeFranco's arrests without probable cause.[3] The complaint asserted that the defendants violated Gobel and DeFranco's constitutional rights by (1) having them arrested without probable cause, (2) issuing false statements to the news media, and (3) subjecting them to illegal conditions of post-arrest confinement.[4] The complaint sought damages and equitable relief in the form of a public apology.

The district court granted a Fed.R.Civ.P. 12(b)(6) dismissal as to Collins, Stoller, and Gary on the ground of absolute prosecutorial immunity. The district court also granted Maricopa County's dismissal mo-

---

1. Ariz.Rev.Stat. § 13–1807(A) states: "A person commits issuing a bad check if he issues or passes a check knowing that he does not have sufficient funds in or on deposit with the bank or other drawee for the payment in full of the check as well as all other checks outstanding at the time of issuance."

2. Plaintiff Earl Edwin Gobel was mistakenly arrested instead of his son, Earl Edwin Gobel, III. Plaintiff Michael DeFranco was mistakenly

arrested instead of an unrelated person with the same name.

3. Although the complaint describes this public roundup as a "sting operation," it appears that the prosecutor was merely publicizing the arrest of bad check offenders.

4. The complaint also alleged numerous state law claims which we do not need to discuss.

tion on the ground that the complaint failed to state a claim against the municipality. The court dismissed the action, and Gobel and DeFranco timely appeal.

## DISCUSSION

We review de novo a district court's dismissal of an action for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *Mir v. Little Company of Mary Hospital,* 844 F.2d 646, 649 (9th Cir.1988). A Rule 12(b)(6) dismissal motion "can be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim." *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir. 1980). We liberally construe civil rights complaints. *Thomas v. Younglove,* 545 F.2d 1171, 1172 (9th Cir.1976).

### I

### Prosecutors

Gobel and DeFranco contend the district court erred in determining that county attorneys Collins and Stoller, and investigator Gary (hereafter collectively referred to as "the prosecutors") are protected by absolute prosecutorial immunity. Specifically, they contend that the prosecutors were not acting in their quasi-judicial capacities when they engaged in the allegedly wrong-

ful conduct.[5] This contention is meritorious.

■ Prosecutors are generally immune from civil damages under section 1983 for actions taken in their official capacities. *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–96, 47 L.Ed.2d 128 (1976); *Ashelman v. Pope,* 793 F.2d 1072, 1075–76 (9th Cir.1986) (en banc).[6] A prosecutor enjoys absolute immunity when he acts within the scope of his authority and in a quasi-judicial capacity. *Ashelman,* 793 F.2d at 1075; *Ybarra v. Reno Thunderbird Mobile Home Village,* 723 F.2d 675, 678 (9th Cir. 1984).[7] Quasi-judicial activities are those which are "intimately associated with the judicial phase of the criminal process." *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995. "The focus of the [immunity] analysis ... is on the nature or function of the prosecutor's activity," and absolute immunity is warranted when the prosecutor acts as an advocate in initiating a prosecution and presenting the state's case. *Ybarra,* 723 F.2d at 678 (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 994–95). While a prosecutor's preparation for the initiation of the criminal process may require obtaining, reviewing, and evaluating evidence, at some point the prosecutor stops functioning as an officer of the court and loses the protection of absolute immunity. *See Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33.[8]

---

5. "The county attorney is the public prosecutor of the county." Ariz.Rev.Stat. § 11–532(A). Investigators, employed by a prosecutor and performing investigative work in connection with a criminal prosecution, are entitled to the same degree of immunity as prosecutors. *Freeman ex rel. the Sanctuary v. Hittle,* 708 F.2d 442, 443 (9th Cir.1983); *Keating v. Martin,* 638 F.2d 1121, 1122 (8th Cir.1980). The complaint alleged that Gary "is an investigator on behalf of the Maricopa County Attorney's Office, who is employed by ... Maricopa County." It is unclear from this allegation whether Gary was employed by the county, the county attorney, or both. In any event, we will assume for purposes of this discussion that Gary is entitled to the same immunity as Collins and Stoller.

6. In addition to damages, Gobel and DeFranco sought equitable relief in the form of a public apology to be issued by the defendants. Prosecutorial immunity only protects the defendants from section 1983 damage claims; it does not protect them from suits for injunctive relief. *See Supreme Court of Virginia v. Consumers*

*Union of the United States, Inc.,* 446 U.S. 719, 736–37, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641 (1980); *see also Pulliam v. Allen,* 466 U.S. 522, 541–42, 104 S.Ct. 1970, 1980–81, 80 L.Ed.2d 565 (1984) (judicial immunity does not bar prospective injunctive relief); *Ashelman,* 793 F.2d at 1075 (same). Thus, even if Collins, Stoller, and Gary were immune from damages, they would not be immune from equitable remedies.

7. "Scope of authority" encompasses those acts having some connection to the general matters committed to the prosecutor's control or supervision. *Ybarra,* 723 F.2d at 678. Gobel and DeFranco do not contend that the prosecutors acted outside the scope of their authority. The issue of prosecutorial immunity here turns solely on the second prong of the test: whether the prosecutors were acting in a quasi-judicial capacity.

8. Although the complaint alleged that Collins ordered the public roundup of bad check offenders in order to enhance his political career,

## A. False Arrest

The complaint alleged that, due to an inadequate pre-arrest investigation, the prosecutors failed to ascertain the correct identity of the persons meant to be arrested, and thereby caused Gobel and DeFranco to be arrested without probable cause. An arrest without probable cause violates the fourth amendment and gives rise to a claim for damages under section 1983. *McKenzie v. Lamb,* 738 F.2d 1005, 1007 (9th Cir.1984).

"[A]bsolute prosecutorial immunity attaches to the actions of a prosecutor if those actions were performed as part of the prosecutor's preparation of his case, even if they can be characterized as 'investigative' or 'administrative.' " *Demery v. Kupperman,* 735 F.2d 1139, 1143 (9th Cir. 1984), *cert. denied,* 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985). *See also Freeman ex rel. the Sanctuary v. Hittle,* 708 F.2d 442, 443 (9th Cir.1983) ("Investigative functions carried out pursuant to the preparation of a prosecutor's case ... enjoy absolute immunity."). However, where a prosecutor commits acts that are usually related to routine police activity, as opposed to judicial activity, absolute immunity does not apply. *See Jacobson v. Rose,* 592 F.2d 515, 524 (9th Cir.1978) (prosecutors, who joined police in implementing a wiretap to uncover information about a possible kidnapping, were not entitled to absolute immunity), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); *Robichaud v. Ronan,* 351 F.2d 533, 536–37 (9th Cir.1965) (prosecutors who allegedly directed police to coerce confession from suspect not entitled to absolute immunity because interrogation is ordinarily a police activity).

Numerous courts have held that prosecutors are not entitled to absolute immunity when they take part in the preliminary gathering of evidence that may ripen into a potential prosecution. *See Barbera v. Smith,* 836 F.2d 96, 100 (2d Cir.1987) (prosecutor not entitled to absolute immunity

when acquiring evidence that might be used in a prosecution, as opposed to organizing, evaluating and marshalling this evidence to facilitate seeking a warrant or indictment), *petition for cert. filed,* June 13, 1988; *Joseph v. Patterson,* 795 F.2d 549, 555 (6th Cir.1986) (remand for further development of factual record to determine whether prosecutor's interrogation of witness was to prepare testimony for case presentation or for police-like investigation), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 516 (1987); *Rex v. Teeples,* 753 F.2d 840, 844 (10th Cir.) (prosecutor's interrogation of a general suspect was police-type work), *cert. denied,* 474 U.S. 967, 106 S.Ct. 332, 88 L.Ed.2d 316 (1985); *McSurely v. McClellan,* 697 F.2d 309, 320 (D.C.Cir.1982) (distinguishing decision to initiate prosecution from earlier, preliminary gathering of evidence that may blossom into a prosecution); *Marrero v. City of Hialeah,* 625 F.2d 499, 510 (5th Cir.1980) ("a prosecutor who participates in a search and seizure is essentially performing functions analogous to those of a policeman ferreting out crime and consequently is making the same kinds of decisions which a policeman makes"), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); *Jacobson,* 592 F.2d at 524 (no absolute immunity for prosecutors who joined sheriffs in implementing a wiretap).

Gobel and DeFranco have alleged that the prosecutors acted in a non-prosecutorial investigatory role. Given the limited factual record at this point in the proceedings, it does not appear beyond doubt that the plaintiffs will be unable to prove that the prosecutors were engaging in police-type investigative work. In a memorandum in support of their dismissal motion, the defendants described the genesis of a bad check prosecution in Arizona as follows: when a check that has been returned for insufficient funds is presented by a merchant to the county attorney's office, the county attorney investigates to determine who wrote the check, files charges if warranted, and then goes to a magistrate for

it is clear that his motivation "should play no role in the immunity analysis." *Ashelman,* 793 F.2d at 1078.

issuance of an arrest warrant. Gobel and DeFranco may be able to prove that the initial investigation to determine who wrote the bad checks is a police function that is preliminary to and separate from the subsequent quasi-judicial determination to prosecute. If they also demonstrate that the prosecutors' misconduct during this police-like investigative stage caused their false arrest, Gobel and DeFranco will have proved a claim that falls outside the scope of absolute prosecutorial immunity.

Therefore, the district court erred in dismissing the false arrest claims against Collins, Stoller, and Gary.

### B. False Statements to News Media

The complaint alleged that Collins and Stoller violated the plaintiffs' constitutional right to notice and opportunity to be heard before invading their privacy and defaming them. Gobel alleged that he was first taken to a place where the media filmed his arrest, and then taken to jail where reporters filmed him while he was being searched. DeFranco alleged that television reporters filmed his arrest when he arrived at the jail. The complaint further alleged that the prosecutors falsely accused Gobel and DeFranco of criminal conduct at these media events. The district court appears to have held that this false statement claim fell within the scope of prosecutorial immunity because the "publicity of sting operations serves as a substantial crime deterrent." This ruling was in error.

■ Gobel and DeFranco correctly contend that a prosecutor's public statements regarding criminal proceedings are not protected by absolute immunity because they are not quasi-judicial acts. *See Powers v. Coe*, 728 F.2d 97, 103 (2d Cir.1984) (extraneous statements to the press designed to gain unfair trial advantage); *Marrero v. City of Hialeah*, 625 F.2d 499, 506 (5th Cir.1980) (public announcement of arrest and seizure of stolen property), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed. 2d 337 (1981); *Helstoski v. Goldstein*, 552

F.2d 564, 566 (3d Cir.1977) (deliberate leaks of false information designed to damage plaintiff's political career).

■ Moreover, Gobel and DeFranco have properly alleged the kind of "defamation plus" injury necessary to state a cognizable section 1983 claim. The Supreme Court held in *Paul v. Davis*, 424 U.S. 693, 712–14, 96 S.Ct. 1155, 1165–67, 47 L.Ed.2d 405 (1976), that injury to reputation alone does not state a section 1983 claim. Gobel and DeFranco have stated a proper section 1983 claim, however, because they alleged that the false statements were made in connection with their illegal arrest.[9] *See Marrero*, 625 F.2d at 516–19 (prosecutor could be liable for false media announcement that stolen property had been recovered from plaintiffs' jewelry store, where plaintiffs also alleged that the search and seizure was illegal); *Stevens v. Rifkin*, 608 F.Supp. 710, 727–28 (N.D.Cal. 1984) (police officer could be liable for false media statements about criminal charges against White Panther Party because "the defamatory statements were made in connection with [plaintiffs' allegedly] unconstitutional arrests and prosecution."). *See also Johnson v. Barker*, 799 F.2d 1396, 1399 (9th Cir.1986) (alleged defamation did not state section 1983 claim because plaintiffs asserted reputation injury only and failed to allege reputation-plus injury as in *Marrero*).

Collins and Stoller are not entitled to absolute immunity because the act of making false public statements about arrestees is not intimately associated with the judicial phase of the criminal process. *See Imbler*, 424 U.S. at 430–31, 96 S.Ct. at 994–96. Therefore, the district court erred in dismissing the false statement claim as barred by prosecutorial immunity.

### C. Illegal Detention Conditions

■ The complaint alleged that the prosecutors subjected Gobel and DeFranco to illegal conditions of confinement following their arrest. Gobel alleged that he was

---

**9.** The complaint alleged that Collins and Stoller violated the plaintiffs' due process rights by "publishing false and defamatory statements in connection with an unlawful arrest and seizure" without giving them notice and an opportunity to be heard.

detained for four hours in a metal police wagon in 108 degree heat without food, water or adequate ventilation. DeFranco alleged that he was detained in a metal police van for more than seven hours in 108 degree heat without food, water, bathroom facilities, or adequate ventilation. It appears that these prolonged detentions were connected to the publicizing of their arrests.[10]

The complaint asserts a valid section 1983 claim because it alleged that the detention conditions violated due process. "Due process requires that a pretrial detainee not be punished." *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979). *See Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1350–51 (7th Cir.1985) (valid section 1983 claim stated by allegation that plaintiffs were detained unnecessarily for four hours in holding cell following arrest); *Walters v. Village of Oak Lawn,* 548 F.Supp. 417, 420 (N.D.Ill.1982) (valid section 1983 claim where arrestee alleged he was put on cold cement floor of unlit, unfurnished detention unit).

The prosecutors are not entitled to absolute immunity on the claim that they illegally punished Gobel and DeFranco during their post-arrest detention, because such conduct is not intimately associated with the judicial phase of the criminal process and has nothing to do with a prosecutor's role as an advocate. *See Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 994–95; *Ybarra,* 723 F.2d at 678. *See also Price v. Moody,* 677 F.2d 676, 678 (8th Cir.1982) (no absolute prosecutorial immunity if prosecutor directed others to subject convictee to illegal custody conditions). Because Gobel and DeFranco may be able to prove that the prosecutors are responsible for their illegal post-arrest detention, the district court erred in dismissing this claim.[11]

## II

## The County

The district court erred in determining that the complaint failed to state a claim against Maricopa County. The complaint stated at least two different viable theories against the county.

### A. County Attorney as Municipal Policymaker

A municipality or governmental entity cannot be found liable under section 1983 on a *respondeat superior* theory; such liability can be imposed only for injuries inflicted pursuant to an official governmental policy or custom. *See Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 690–94, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037. While a single decision may satisfy *Monell's* municipal policy requirement, that decision must have been proper-

---

10. Gobel alleged that he was "driven to a location selected by defendants ... for the purpose of having television and other media sources take pictures and video to broadcast his arrest" and that when he was later booked into jail "a television crew filmed the proceedings." DeFranco alleged that when he "arriv[ed] at the jail, television crews were waiting to film his arrest." It appears that Gobel and DeFranco were booked at the same time, about 1:30 p.m., although DeFranco had been arrested three hours earlier than Gobel. The complaint alleged that Collins and Stoller "intentionally arranged publicity to advertise the arrests." Because civil rights complaints should be liberally construed, it appears that Gobel and DeFranco may be able to prove that the defendants ordered these prolonged detentions in order to have them on hand for a pre-scheduled media event.

11. Gobel and DeFranco also alleged that conditions in their respective jail cells were inadequate. DeFranco further alleged that his hands became swollen from tight handcuffs, and that he was subsequently denied medical attention. The complaint does not appear to allege, however, that Collins, Stoller, or Gary were responsible for these conditions or that the jail conditions were in any way connected with the press conference. Without pleading and proving such a causal connection, Gobel and DeFranco will not be able to prevail against the prosecutors on these claims of inadequate jail conditions and denial of medical treatment.

ly made by one of the municipality's authorized decisionmakers; that is, by an official who "possesses final authority to establish municipal policy with respect to the [challenged] action." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). In *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988), the Supreme Court pointed out that "whether a particular official has 'final policymaking authority' is a question of *state law*." "[S]tate law ... will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* 108 S.Ct. at 924–25.[12]

The complaint alleged that Maricopa County "by policy, custom, and law authorized and delegated" Collins and Stoller "the authority to be the final policymakers regarding the investigation of [bad check offense] charges" under Ariz.Rev.Stat. § 13–1807,[13] and that pursuant to this authority Collins and Stoller had the plaintiffs arrested and publicized their arrests without conducting a reasonable investigation to determine whether there existed probable cause to make the arrests.[14] In granting Maricopa County's motion to dismiss, the district court entirely rejected the notion that by enforcing the bad check law

the county attorney could be said to be acting as a policymaker for the county:

> [T]he county attorney and his agents were following the statutory mandate ... from the state legislature, and, therefore, any policy would be set only within the county attorney's office in its prosecutions of these matters for the state.... Under [the bad check law] the county attorney establishes and exercises policy, not on behalf of Maricopa County, but solely on his own behalf ... [The] authority to act devolves only upon the county attorney; it does not in any way pass through the county itself.

Likewise, Maricopa County contends on appeal that it cannot be held liable for any misconduct by the county attorney because he is not employed by the county, but is a separate elected official whose powers and duties are defined by state statute. The county contends that in criminal prosecutions the county attorney acts on behalf of the state, not the county.

These analyses are erroneous and their conclusions are not necessarily correct. By establishing investigative and enforcement policies for prosecuting bad check offenses, the county attorney, as the chief prosecutorial official for the county, may indeed be acting as a policymaker for the county.

Several courts have held that the official conduct and decisions of elected city or county officers may automatically consti-

---

**12.** We have already noted that "[t]he plurality and concurrence [in *Praprotnik*] differ as to whether the identification of policymakers is purely a question of state law or a question of fact." *Hammond v. County of Madera*, 859 F.2d 797, 802 n. 1 (9th Cir.1988). As discussed *infra*, the district court here failed to appropriately analyze the plaintiffs' municipal policy-maker allegations, but rather rejected these allegations out of hand. Because the district court did not have the benefit of the *Praprotnik* ruling when it dismissed the complaint, we leave it to the district court to determine on remand how and whether the plaintiffs can prove that the county attorneys acted as policymakers for Maricopa County in the circumstances of this case.

**13.** Ariz.Rev.Stat. § 13–1807 provides a definition of "issuing a bad check" (*see supra* n. 1) and states that this offense is a "class 1 misdemeanor."

**14.** The complaint also alleged that Maricopa County authorized Collins and Stoller to estab-

lish county policy regarding the administration of the deferred prosecution program under Ariz. Rev.Stat. § 13–1810. This statute gives a county attorney the authority to create "a deferred prosecution program for bad check cases." Under the program, prosecution may be deferred up to six months pending the defendant's completion of an educational program and full restitution to the victim. Gobel and DeFranco do not allege that they should have been placed in the deferral program; they only claim that they should not have been arrested because there was no reason to believe they were guilty of issuing bad checks. The operation of the deferral program does not appear to have any direct bearing on their claims that they were wrongly arrested and then defamed. The deferred prosecution statute, by its terms, "does not limit the power of the county attorney to prosecute bad check complaints." Ariz.Rev.Stat. § 13–1810(B).

tute official city or county policy. In *Blackburn v. Snow,* 771 F.2d 556, 571 (1st Cir.1985), a county sheriff's policy of strip-searching all visitors to the county jail was held to constitute a county policy. The court noted that under Massachusetts law the county sheriff was expressly responsible for security at county correctional facilities, and that because this county sheriff had appointed himself superintendent of the county's jails he had statutory authority to control all visitation to the county jail. The court also pointed out that the sheriff was the county official elected by the county voters to act for them in this domain and to exercise the powers created by state law. For these reasons, the sheriff's strip search policy *was* the county's policy and the county could be liable for any injuries inflicted pursuant to that policy. *Id.*

In *Crane v. Texas,* 759 F.2d 412 (5th Cir.), *aff'd in part and rev'd in part,* 766 F.2d 193 (1985) (per curiam), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985), a district attorney had created a procedure whereby a court clerk would issue misdemeanor arrest warrants based solely on a district attorney's affidavit and without any probable cause determination by a neutral magistrate. The district court held that the county could not be liable in a section 1983 action challenging the constitutionality of this warrant procedure because the procedure was " 'neither done for the county nor subject to its control.' " *Id.* at 428. The Fifth Circuit reversed, holding that since county voters had elected the district attorney (who then established the misdemeanor arrest policy by virtue of his

office), the district attorney was a county policymaker and his warrant procedure was a county policy. *Id.* at 429–30. "[B]ecause the ultimate authority for determining County capias procedures reposed in the District Attorney, an elected County official, his decisions in that regard must be considered official policy attributable to the County." *Id.* at 430.

In denying rehearing, the Fifth Circuit rejected the argument that the Texas district attorney was a state, not a county officer. *Crane v. Texas,* 766 F.2d 193, 194–95 (5th Cir.) (per curiam), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985). Although the district attorney had some attributes of a state official (e.g., office created by state constitution, geographic authority created by state statute, governor appoints interim successor if vacancy occurs, bond for faithful performance of duties runs to governor), the court found that other considerations led to the conclusion that he was a county official (e.g., elected by county or district voters, prosecutorial authority limited geographically to district, paid by county funds even though county partly reimbursed by state, other local offices also created by the state constitution). *Id.* at 194–95. "In sum, much like the county itself, his office is a local entity, created by the State of Texas and deriving its powers from those of the State, but limited in the exercise of those powers to the county, filled by its voters, and paid for with its funds." *Id.* at 195.[15]

Gobel and DeFranco may be able to prove that in Arizona the county attorney is the kind of county official whose policy decisions automatically constitute county

---

**15.** Both *Blackburn* and *Crane* rely on the following rationale set forth in *Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980):

> Because of the unique structure of county government in Texas, the judge—like other elected county officials, such as the sheriff and treasurer—holds virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein. Thus, at least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one "whose edicts or acts may fairly be said to

> represent official policy" for which the county may be held responsible under section 1983. (citations omitted)

We have previously cited *Familias Unidas* in determining that the structure of a particular city government belied the city's argument that a section 1983 plaintiff's firing was the isolated act of an individual city employee rather than the result of a municipal policy. *See McKinley v. City of Eloy,* 705 F.2d 1110, 1116 (9th Cir. 1983). *See also Overbay v. Lilliman,* 572 F.Supp. 174, 176–77 (W.D.Mo.1983) (elected county sheriff's policies became county policies because sheriff was the "chief law enforcement officer of the county").

policy. An Arizona county attorney is elected by the county voters, Ariz. Const. Art. 12 § 3, is an "officer of the county" who is required to reside in the county, Ariz.Rev.Stat. §§ 11–401(A)(5) and 11–404(6), and is the "public prosecutor of the county" who "[a]ttend[s] the superior and other courts within the county and conduct[s], on behalf of the state, all prosecutions for public offenses." Ariz.Rev.Stat. § 11–532(A)(1). His budget is set by the county board of supervisors, Ariz.Rev.Stat. §§ 11–201(A)(6), and he picks a chief deputy whose salary is set by agreement between the county attorney and the board of supervisors. Ariz.Rev.Stat. § 11–419(D) and (E). This is not, of course, an exhaustive enumeration of an Arizona county attorney's powers and responsibilities (nor does it address the role of an Arizona assistant county attorney), but it is sufficient to indicate that Gobel and DeFranco may be able to prove that County Attorney Collins was acting as a policymaker for Maricopa County when he decided to hold a public roundup of bad check offenders, and that Maricopa County is therefore liable if the carrying out of that policy violated the plaintiffs' civil rights.

### B. County's Failure to Train

■ Maricopa County may be liable under section 1983 if it had a practice of gross negligence in training or supervision, and if Gobel and DeFranco can establish an affirmative link between the inadequate training and their alleged constitutional deprivations. *See Perez v. Simmons,* 859 F.2d 1411, 1417 (9th Cir.1988); *Bergquist v. County of Cochise,* 806 F.2d 1364, 1370 (9th Cir.1986). We held in *Bergquist* that an allegation that the county had failed to properly train and instruct its police officers in the necessity to verify informant data before seeking a search warrant stated a valid section 1983 claim. *Bergquist,* 806 F.2d at 1367, 1370.

Gobel and DeFranco alleged in their complaint that Maricopa County "fail[ed] to provide any supervision or procedures to be followed by" Collins, Stoller, and Gary "prior to requesting or causing the arrest of an individual for allegedly violating" the bad check law. At oral argument, the plaintiffs asserted that Maricopa County had failed to insure that the persons seeking arrest warrants had adequate training and supervision regarding the proper methods and standards for verifying the information used to determine that probable cause to arrest existed. They also asserted that a county investigator, who had no training or supervision, recklessly decided to seek an arrest warrant for Gobel after doing a handwriting comparison. If Gobel and DeFranco can prove that their mistaken arrests were caused by this failure to train, they will have made out a valid section 1983 claim against Maricopa County. *See Perez,* 859 F.2d at 1417–18 (directed verdict for city reversed because evidence showed that city had "no written guidelines on searching a third person's home in which the subject of an arrest warrant is believed to be staying" and two officers "testified that they believed, as a result of their training and indoctrination as to department policy, that a search of a third-party home was legal if the subject of the arrest warrant had been staying temporarily at the residence.").

### CONCLUSION

The judgment is reversed, and the case is remanded to the district court for further proceedings.