Johnny Lee JACKSON,
Plaintiff–Appellee,

v.

Daryl GATES; City of Los Angeles,
Defendants–Appellants.

No. 90–55728.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 3, 1991.

Decided Sept. 17, 1992.

As Amended Nov. 27, 1992.

---

Arthur B. Walsh, Deputy City Atty., Los Angeles, Cal., for defendants-appellants.

Michael P. Stone, Stone, Feeley & De-Pasquale, Los Angeles, Cal., for plaintiff-appellee.

Before: PREGERSON, CANBY and RYMER, Circuit Judges.

PREGERSON, Circuit Judge:

The City of Los Angeles and Los Angeles Police Chief Gates (collectively "appellants") appeal the denial of their motions for summary judgment, directed verdict, new trial, and judgment notwithstanding the verdict, and the jury award in favor of Los Angeles Police Officer Johnny Lee Jackson. Jackson brought this action after being discharged for refusing to comply with an order to provide a urine sample for drug testing. We hold that appellants' termination of Jackson because he refused to comply with the order violated his Fourth Amendment rights. Further, we hold that the jury was properly instructed on the applicable Fourth Amendment standard, which required the police to demonstrate an articulable reasonable basis for suspecting Jackson of drug use before ordering him to submit to the urinalysis.

## BACKGROUND

Los Angeles Police Department ("LAPD") Officers Leach and Jackson were assigned to the same police station. Sometime before February 1986, the Internal Affairs Division of the LAPD ("IAD") began conducting undercover surveillance of Officer John Leach, whom they suspected of illegal drug use. IAD undercover officers saw Jackson and Leach together on two separate occasions during their investigation.

On the afternoon of February 13, 1986, Jackson got into Leach's car, and the two drove to an apartment building in Hollywood. The building was known by the IAD officers to be the site of narcotics sales and use. Leach entered the building while Jackson remained in the car. Leach

returned with a woman, and the three drove to another apartment building also considered by the IAD officers to be a location of illegal drug sales and use. Leach and the woman went into that building while Jackson again waited in the car. Leach returned alone, and the two drove to Leach's residence in North Hollywood.

After some time at Leach's residence, the two returned to the second apartment building. As before, Leach entered the building while Jackson waited in the car. The two left, with Leach driving in a manner characterized by the surveilling officers as "calculated to avoid being followed."

The IAD's undercover surveillance of Leach then ceased until February 20, 1986. On that day, undercover IAD officers saw Leach and Jackson leave the station together after both had finished their work shifts. Leach drove with Jackson to Exposition Park where, according to the officers, the two drank beer and talked. Later that evening, Leach returned alone to one of the buildings believed by police to be a "narcotics location."

The IAD officers then took Leach into custody. Pursuant to a warrant, the Officers searched Leach's car, uncovering "a tinfoil bindle which in size and shape was consistent with the packaging of cocaine."

Under orders from their captain, IAD officers went to Jackson's home on February 21, 1986, at 1:30 a.m., and ordered him to provide a urine specimen. Jackson objected. The officers then ordered Jackson to accompany them to Parker Center in downtown Los Angeles.[1]

Once there, Jackson met with a union representative of the Los Angeles Police Protective League ("League"). Jackson then received a formal order to provide a urine sample under contemporaneous observation by an IAD officer in the public restroom for drug testing. He refused the order.[2]

---

1. The parties agree that Jackson was not under arrest. Jackson claims, however, that he was taken to the station against his will. Appellants claim that Jackson was free to disobey, subject "only to the risk of administrative discipline."

2. At some point, Jackson was informed by IAD investigators that refusing the order could result in disciplinary action.

On July 24, 1986, Jackson was suspended without pay pending a hearing on the charge of insubordination. An administrative panel found Jackson guilty of refusing to comply with a lawful order, and recommended discharge from the LAPD. Police Chief Gates accepted the panel's finding, and terminated Jackson effective July 24, 1986. *See* Charter of the City of Los Angeles §§ 202(12)–(13).

Jackson pursued the grievance procedures available to him, which provided that his dispute with the LAPD be submitted to binding arbitration. The arbitrator concluded that the labor agreement between the League and the LAPD did not authorize compulsory urinalysis in Jackson's case. A year and one-half later, the LAPD reinstated Jackson and restored his lost benefits, including back pay, in accordance with the arbitrator's decision.

Jackson filed this lawsuit claiming damages under 42 U.S.C. § 1983 for alleged violations of his Fourth, Fifth, and Fourteenth Amendment rights. The parties on both sides filed motions for summary judgment.[3] The district court granted summary judgment for all defendants sued in their individual capacity, including Police Chief Gates, on grounds of qualified immunity.[4] Appellants' motion for summary judgment on the issues of Jackson's Fourth Amendment claim and municipal liability was twice denied.

Following trial, the jury returned a verdict for Jackson of $154,747. The district court entered judgment on the verdict, and denied motions filed by appellants for a directed verdict, for judgment notwithstanding the verdict or, in the alternative, for a new trial. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291.

## DISCUSSION

### I. Fourth Amendment Claim

Appellants contend that the district court erred by denying their motion for summary judgment on Jackson's Fourth Amendment claim under 42 U.S.C. § 1983. Specifically, appellants argue that the order to Jackson to submit to a urinalysis drug test was reasonable under the Fourth Amendment even absent a reasonable individualized and articulated suspicion of drug use, impairment, or ingestion.[5]

### A. Jackson's Rights Under the Fourth Amendment

We review the district court's grant of a motion for summary judgment de novo. *Kruso v. International Tel. & Tel. Corp.,* 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material

3. Jackson's claims under the Fifth and Fourteenth Amendments and under state law were denied on summary judgment. Although not initially raised on appeal, we requested the parties to submit briefs concerning whether the district court erred in dismissing the Fifth Amendment claim.

4. Specifically, the district court found that the right to be free from compulsory urinalysis in the absence of reasonable suspicion was not clearly established in February 1986.

5. Before trial, appellants contended that the drug testing order given to Officer Jackson was consistent with the Memorandum Of Understanding ("MOU") in effect under the collective bargaining agreement between the LAPD and the League. The MOU addressed the specific issue of an officer's right to be free from random or arbitrary searches as follows:

An employee shall not be required to submit a sample of blood, breath, or urine for the pur-

poses of determining the presence of a narcotic, drug, or alcohol, nor shall an employee be required to submit to a field sobriety examination unless:

The employee exhibits objective symptoms of being under the influence of alcohol and/or a narcotic or drugs; OR

There is substantial evidence to indicate the officer has ingested or absorbed by the body in any other manner an alcoholic beverage, narcotic, or drug.

Memorandum of Understanding, Article 37. Due to the absence of "objective symptoms" or "substantial evidence" that Jackson was under the influence of narcotics, the arbitration board found the IAD's request to Jackson improper. Accordingly, Jackson was reinstated with back pay in his position prior to trial. This appeal does not concern that reinstatement or arbitration award.

fact, and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

Appellants argue that the Supreme Court's decisions in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), require no degree of individualized suspicion before ordering a police officer to submit to an administrative drug test. Thus, they contend that the order compelling Jackson to submit to urinalysis was not constitutionally unreasonable. We do not agree that these cases support the result appellants suggest.

■ It is well established that a urinalysis drug test is a search within the meaning of the Fourth Amendment. *See Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390; *Railway Labor*, 489 U.S. at 617, 109 S.Ct. at 1412; *International Bhd. of Teamsters v. Department of Transp.*, 932 F.2d 1292, 1299 (9th Cir.1991). To be deemed reasonable, a search generally must be supported by a warrant issued upon probable cause. *Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390. However, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Id.*

In *Von Raab*, the Supreme Court considered the constitutionality of drug testing of U.S. Customs Service employees interested in transfer or promotion to positions involving exceptional duties such as drug interdiction and the use of firearms. The Court held that "where a Fourth Amendment intrusion serves special governmental needs, *beyond the normal need for law enforcement*, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Id.* at 665–66, 109 S.Ct. at

1390 (emphasis added). Applying this balancing test, the Court concluded that the government's interests in safeguarding the national border and in public safety outweighed the privacy expectations of employees who sought certain promotions. *Id.* at 677, 109 S.Ct. at 1396.

In *Railway Labor*, the Court upheld the constitutionality of the drug testing of railway employees involved in certain accidents or who violated certain safety rules. The Court concluded that the government's compelling interest in ensuring public safety outweighed employee privacy concerns and justified post-accident drug testing even absent individualized suspicion. *Railway Labor*, 489 U.S. at 633, 109 S.Ct. at 1421.

■ The purpose of requiring the government to obtain a warrant, or to have probable cause or reasonable suspicion before conducting a search, is to prevent random or arbitrary intrusions by government agents. *Id.* at 621–22, 109 S.Ct. at 1415. *Von Raab* and *Railway Labor* provide an exception to this requirement where the government demonstrates a compelling safety interest.

■ In the present case, appellants demonstrate no special compelling interests under *Von Raab* or *Railway Labor*, which would justify a search because there was no triggering event or employment pre-promotion requirement[6] involved.

Appellants also offer *National Federation of Federal Employees v. Cheney*, 884 F.2d 603 (D.C.Cir.1989) to support their contention that no degree of individualized suspicion is required for administrative drug testing of police officers. In *National Federation*, civilian police officers employed by the Army were subjected to random drug testing for administrative purposes with no "limiting factor" other than mere randomness. The court found the program constitutionally acceptable despite the absence of any individualized suspicion.

However, *National Federation* is inapposite to the present case. Jackson was

---

**6.** Drug testing absent any individualized suspicion was the pre-promotion requirement which the Supreme Court upheld in *Von Raab*.

not ordered to submit to urinalysis as part of a random drug testing program targeted at the entire police force. Rather, Jackson was singled out for testing based only on his association with another officer who was under IAD surveillance.

In sum, the IAD had no articulable, individualized basis for suspecting that Jackson was using narcotics. Nor was he tested through some random testing program being administered to the police force. Further, appellants demonstrate no special compelling interests which would justify the order given to Jackson. Thus, it was unreasonable under the Fourth Amendment for the IAD to order Jackson to provide a urine sample for drug testing.

### B. Constitutional Basis for Jackson's Claim

■ The issue was raised whether Jackson's Fourth Amendment rights were actually violated since he did not comply with the urinalysis order. As the Supreme Court pointed out in *Gardner v. Broderick*, 392 U.S. 273, 276–79, 88 S.Ct. 1913, 1915–16, 20 L.Ed.2d 1082 (1968), it is improper to discharge an officer from duty to punish him for exercising rights guaranteed to him under the constitution. Thus, it is established law that no one should suffer harm by state action for asserting a constitutionally protected right.

The jury found that the order Jackson disobeyed required him to submit to an unconstitutional search. Because the right to be free from unreasonable searches is contained explicitly in the Fourth Amendment, it follows that the right to be free from adverse consequences for refusing to submit to an unreasonable search must also be found there.

*Los Angeles Police Protective League v. Gates*, 907 F.2d 879 (9th Cir.1990), supports this proposition. There, we held that disciplining police officer Gibson for his refusal to accede to an unconstitutional search warrant violated his Fourth Amendment rights. Although we did not state that this protection was specifically enumerated under the Fourth Amendment, there was "little doubt that it was improper for the [City]

to discipline Gibson when he refused to allow a search of his garage." *Id.* at 886.

In the present case, Jackson did not actually submit to the IAD order to provide a urine specimen for drug testing. However, it is not necessary for the physical search to have occurred. The City's firing of Jackson for his refusal to submit to the unconstitutional search is sufficient to maintain Jackson's claim that his Fourth Amendment rights were violated.

### C. Jury Instructions

■ We review jury instructions to determine whether, "considering the charge as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading." *Thorsted v. Kelly*, 858 F.2d 571, 573 (9th Cir.1988). "The trial judge has substantial latitude in tailoring the instructions, and challenges to the formulation adopted by the court are reviewed for abuse of discretion." *U.S. v. Beltran–Rios*, 878 F.2d 1208, 1214 (9th Cir.1989).

■ The district court instructed the jury that drug testing by urinalysis is a search within the meaning of the Fourth Amendment. In addition, the court instructed the jury that the search was reasonable only if supported by "an individualized, articulated reasonable suspicion, based on objective facts, of drug use, impairment, or ingestion." By returning a verdict for Jackson, the jury found that the order to Jackson was unreasonable according to the standard set out in the court's instructions.

Chief Gates and the City of Los Angeles argue that the district court's instructions were erroneous because they instructed the jury to apply an overly stringent standard for determining the reasonableness of compelled urinalysis. In addition, they contend that the court erred in refusing their proffered instructions that the Fourth Amendment does not require a finding of individualized suspicion to justify the reasonableness of the order to search Officer Jackson. We disagree.

■ Contrary to appellants' assertions, the jury instructions given represent an

accurate interpretation of our Fourth Amendment case law and are consistent with recent Supreme Court decisions that we have already discussed. The district court concluded, and we agree, that the standards developed by the Supreme Court upholding the validity of random, post-accident, or pre-ascension drug testing programs against Fourth Amendment challenge are inapplicable to suspicion-based drug testing. Accordingly, the jury instructions were correct.

## II. Municipal Liability under § 1983

The City contends that it cannot be liable because Jackson was not disciplined pursuant to an unconstitutional municipal policy. Specifically, it claims that because the injury suffered by Jackson was not a product of a policy intended for the purpose of violating Jackson's constitutional rights, it was not liable for the harm caused by the unconstitutional order. Further, it contends that the actions of Police Chief Gates and the Police Board of Review do not create liability because neither party is a "final policy-maker" as required under 42 U.S.C. § 1983.

Several requirements must be satisfied for a municipality to incur liability. First, the injury must amount to a constitutional deprivation. *St. Louis v. Praprotnik*, 485 U.S. 112, 121, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988). As noted above, the jury found that the drug testing order was unreasonable and thus violated Jackson's Fourth Amendment rights.

Second, the municipality will be held to have caused an injury only when the acts which produce it were sanctioned by the municipality. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). The City contends that it did not officially order or condone the police department's violation of Jackson's civil rights. Therefore, it claims that it did not sanction the action which resulted in Jackson's constitutional deprivation. Although the City cites to no authority, it further asserts that it cannot

be held liable because it cannot be charged with knowing that punishing Jackson for refusing the order would amount to a Fourth Amendment violation. It contends that any other result would be to impose liability on a municipality whenever any interim action was later found to have violated a person's constitutional rights.

As noted above, the MOU specified the circumstances under which an officer could be subjected to a urinalysis order. *See supra*, note 5. Despite whether the City's policy-makers knew that the order would subject the City to liability, they were aware that the order was arguably improper. Further, in this circuit a policy itself need only cause a constitutional violation; it need not be unconstitutional per se. *McKinley v. City of Eloy*, 705 F.2d 1110, 1117 (9th Cir.1983).

In the present case, Jackson concedes that the City had no policy requiring unreasonable searches of its police officers. His termination was the result of the City's official municipal policy and custom manifested in the "obey now—grieve later" rule. Although this policy is not per se unconstitutional, Chief Gates' implementation of the policy resulted in a constitutional tort against Jackson.[7] Thus, the City is liable to Jackson for civil damages, whether or not they intended the result or had full knowledge of the possible consequences of their actions.

■ The third requirement specifies that only municipal officials who have "final policy-making authority" may, by their actions, subject the municipality to § 1983 liability. *Pembaur v. City of Cincinnati*, 475 U.S. at 480, 106 S.Ct. at 1299. The determination of who constitutes a "final policy-maker" for purposes of § 1983 is a question of state law. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 122–30, 108 S.Ct. 915, 924–28, 99 L.Ed.2d 107 (1988); *Gobel v. Maricopa County*, 867 F.2d 1201, 1207 (9th Cir.1989). The district court's interpretation of state law is reviewed de novo. *Salve Regina College v.*

---

7. Jackson's challenge to the City's "obey now—grieve later" policy, as applied by the City's policymaker even to unconstitutional orders, is what differentiates this case from *Los Angeles Police Protective League v. Gates*, 907 F.2d 879 (9th Cir.1990). In *Protective League*, there appears to have been no such challenge, and our discussion of municipal liability focused only on the absence of a City policy of carrying out unconstitutional administrative searches of police officers' homes. *See id.* at 890.

*Russell,* — U.S. —, —, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991); *Matter of McLinn,* 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).

■ Appellants contend that Chief Gates is not the final authority concerning the termination of an officer because ultimately the officer may submit the matter to arbitration for consideration under the collective bargaining agreement between the League and the City. Following a hearing, the arbitrator may require the City to reinstate the officer.

This contention is without merit as it completely misconstrues the roles of both Chief Gates and the arbitration board. Under the Charter of the City of Los Angeles, the applicable state law in this case, the police chief is clearly the final authority on disciplining officers. The arbitrator is a neutral entity who "is confined to interpretation and application of the collective bargaining agreement," thus merely implementing the intent of the parties. *United Steel Workers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). The arbitrator has no authority to set or alter any policy whatsoever.

Alternatively, appellants contend that if Gates is found to be the "final policy-making authority," no violation ultimately occurred because Gates' final act was to reinstate Jackson. This contention is also without merit. The fact that the arbitration board required Gates to reinstate Jackson in no way alters the fact that it was Gates and the Police Review Board who caused Jackson's constitutional injury by firing him for refusing to follow an unconstitutional order.

Appellants cite *Gearhart v. Thorne,* 768 F.2d 1072 (9th Cir.1985), to support their assertion that Jackson was not entitled to damages and that reinstatement and back pay were adequate compensation because Jackson was only temporarily deprived of his property interest in his job. There, we held that the remedy of reinstatement and back pay provided by established grievance procedures fully satisfied a state employee's action against the state under § 1983.

However, *Gearhart* is inapposite. Despite his First Amendment claim, Gearhart was ultimately found to have suffered no constitutional violation. He was therefore limited to the remedies provided by the grievance policy. Here, Jackson was found to have suffered a constitutional violation. This entitles him to receive damages as well as the arbitration award of back pay and reinstatement.

Appellants also cite *McKinley v. City of Eloy* as standing for the proposition that Jackson is not entitled to damages. This argument misapprehends our holding in that case. Although appellants correctly quote that "a person discharged for engaging in constitutionally protected activity is entitled to reinstatement", *McKinley,* 705 F.2d at 1116, we went on to uphold McKinley's jury award of monetary damages for emotional pain and suffering, as well as reinstatement and back pay.

Thus, where a constitutional violation has occurred, an individual may pursue remedies beyond those provided by established grievance procedures. Under the City's Charter, the delineated procedures "shall not be construed to in any way affect any other rights any officer … may have to pursue or assert any and all other legal rights or remedies in relation to his office." § 202(18). Although Jackson was ultimately reinstated, his year and one-half unemployment caused him substantial financial damage. Under § 1983 Jackson was entitled to sue for all consequential damages resulting from the violation of his Fourth Amendment rights.

In light of the above, the district court did not err in refusing to grant summary judgment on the issue of municipal liability.

## III. Motions for JNOV, New Trial, and Directed Verdict

The district court's decision to grant or deny judgment notwithstanding the verdict is reviewed de novo. *Peterson v. Kennedy,* 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). We therefore apply the same standard as did the district court

in considering a motion for judgment notwithstanding the verdict. Denial of such a motion is appropriate if the evidence and its inferences, considered as a whole, and viewed in the light most favorable to the non-moving party, cannot reasonably support a judgment in favor of the moving party. *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1151 (9th Cir.1988); *Transgo, Inc. v. Ajac Trans. Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). The district court's decision to grant or deny a motion for new trial is reviewed for abuse of discretion. *Hard v. Burlington Northern R.R.*, 812 F.2d 482, 483 (9th Cir.1987). The standard for reviewing the district court's decision to grant or deny a motion for a directed verdict is the same as for a JNOV. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th Cir.1986), *cert. denied*, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987).

▇▇ Appellants contend that the district court's denial of their motions for judgment notwithstanding the verdict, new trial, and directed verdict was improper. Prior to trial, the district court granted qualified immunity to the individual officers and Gates on the ground that the law was not clearly established in 1986 on the issue of whether one had the right to be free from compulsory drug testing in the absence of reasonable suspicion. Thus, the City contends, the jury could not reasonably have found the City liable to Jackson because the City's policy-makers were not aware that the order was unconstitutional. However, as noted above, one need not intend to commit a constitutional tort to be held liable for the result. Further, in light of the fact that the League and the LAPD had specifically addressed the issue of drug

testing in the MOU, the LAPD had notice of the appropriate standard applicable to their officers.

▇▇ The jury awarded Jackson $154,-747 for damages resulting from the City's violation of his Fourth Amendment rights due to his improper termination. The verdict was not only one that could be reached by a rational jury; it was in accord with the weight of the evidence. Accordingly, the district court did not err in denying appellants' motions for directed verdict or JNOV, and did not abuse its discretion in denying a new trial.

## IV. Fifth Amendment Claim

### A. Procedural Due Process Claim

Both sides agree that Jackson's procedural due process rights were not violated in this matter. He received procedural due process when his grievance was heard and addressed by neutral arbitration. Under the collective bargaining agreement in force, Jackson was entitled to reinstatement and back pay—which he received.

We have held that federal courts will accord collateral estoppel to municipal administrative hearings that have sufficient judicial ·safeguards.[8] *Eilrich v. Remas*, 839 F.2d 630, 632 (9th Cir.) *cert. denied*, 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988). Any further litigation concerning this issue would be inappropriate under the doctrine of collateral estoppel because Jackson already received the necessary opportunity for due process (i.e., he "had his day in court").[9]

### B. Substantive Due Process Claim

Prior to trial, the district court granted the City's motion for summary judgment on Jackson's Fifth Amendment substantive due process claim. Although this claim

---

8. The factors used to determine the existence of these safeguards are whether an administrative agency acted in a judicial capacity and resolved disputed issues of fact properly before it which the parties had an adequate opportunity to litigate, and whether the general collateral estoppel criteria apply. *Eilrich v. Remas*, 839 F.2d 630, 632 (9th Cir.), *cert. denied*, 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988).

9. Before trial, Jackson asserted that the City was collaterally estopped from relitigating whether the City had substantial evidence of drug ingestion to order the test. The district court rejected this claim on the basis that sufficient judicial standards were not met as to that issue. At trial, this issue was litigated and resolved in favor of Jackson.

was not raised by Jackson on appeal, we requested supplemental briefing on the issue.

To support a claimed violation of an individual's substantive due process rights, we have stated that the municipality's conduct must be " 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " *F.D.I.C. v. Henderson*, 940 F.2d 465, 474 (9th Cir.1991) (quoting *Lebbos v. Judges of Super. Ct., Santa Clara County*, 883 F.2d 810, 818 (9th Cir.1989)).

■ Here, the district court found that the City's conduct did not constitute such a violation. The City's "obey now—grieve later" policy is not constitutionally defective on its face. Further, the individual officers who gave Jackson the order were found to be immune from suit because the "law regarding urine testing for drugs was not established at the time of this alleged violation." RT at 5. Although the City was ultimately found to have violated Jackson's Fourth Amendment rights by enforcing the policy against him, it cannot be maintained that the City's actions were wholly arbitrary or unreasonable. Thus, we affirm the district court's order dismissing Jackson's substantive due process claim.

AFFIRMED.

RYMER, Circuit Judge, dissenting:

I dissent, because I believe we are bound by *Los Angeles Police Protective League v. Gates*, 907 F.2d 879 (9th Cir.1990), to ask whether the City or the LAPD ever adopted a policy of carrying out unconstitutional searches of police officers, 907 F.2d at 890. Because there is no evidence that it did, there is no basis for municipal liability.